JOSEPH LEE SHELLENBERGER v. FRANK T. RANSOM ET AL.

FILED JUNE 27, 1894. No. 3147.

1. Statutes should be so construed as to give effect to the intention of the legislature, and if a statute is plain and unambiguous, there is no room for construction or interpretation.

2. Our statute of descent is plain and unambiguous, and by its own operation, and solely in accordance with its own terms, vests in the heir such estate as he is thereby entitled to, *eo instanti*, upon the death of the intestate from whom the inheritance comes.

3. **Descent in Case of Murder of Ancestor by Heir.** The former opinion in this case, reported in 31 Neb., 61, disapproved.

REHEARING of case reported in 31 Neb., 61.

*M. L. Hayward,* for plaintiff in error.

*John C. Watson, Frank T. Ransom, George D. Scofield,* and *E. F. Warren, contra.*

RYAN, C.

An opinion was filed in this case on the 2d day of January, 1891. Subsequently a rehearing was granted, and thereon renewed arguments were made, and the case was again submitted. No controversy is now made as to the applicability of section 30, chapter 23, Compiled Statutes. This question was finally settled by the opinion already filed, which is found reported in 31 Neb., 61. The simplification thus accomplished has left but one question for consideration. This arose upon the demurrer, from which fact it is rendered necessary to state as concisely as possible the facts pleaded.

The petition was filed by Frank T. Ransom and John C. Watson, as plaintiffs, against Joseph L. Shellenberger, as defendant. In brief, this petition contained the averments that Emma Shellenberger, the owner of the northeast quarter of section 5, township 7 north, range 14 east of the 6th P. M., died intestate, leaving as her sole heirs at law her husband, Leander Shellenberger, and her two children, Maggie Shellenberger and Joseph L. Shellenberger; that upon her death the said land descended to her husband, Leander Shellenberger, during his life, during which time he was tenant of said land by his right of curtesy, Maggie and Joseph L. being entitled to the remainder after his death; that on April 29, 1886, Maggie Shellenberger died intestate, leaving as her only heir her father, Leander Shellenberger, whereupon Joseph L.

Shellenberger and Leander Shellenberger became tenants in common of the aforesaid property; that on May 3, 1886, said Leander Shellenberger and his wife, Miranda Shellenberger, by warranty deed duly conveyed their interest in said real property to plaintiffs, the same being, as alleged, the life estate of Leander and the undivided one-half of the remaining estate; that on the 23d day of July, 1887, said Leander Shellenberger departed this life, whereupon plaintiffs and Joseph L. Shellenberger became the owners of said land as tenants in common. There were other allegations made with the view of demonstrating the necessity of a partition. The prayer was as follows: "The plaintiffs therefore pray for judgment confirming the shares of the parties as above set forth, and for a partition of said real estate according to the respective rights of the parties interested therein; or, if the same cannot be equitably divided, that the premises may be sold and the proceeds thereof divided between the parties according to their respective rights, and for such other relief as equity may require."

The initial averments of the answer were in denial of each and every allegation of the petition except as in said answer the same should be expressly and specifically admitted. Following this denial the answer was in this language: "That on or about the —— day of ——, 18—, said Emma Shellenberger died intestate, seized of the premises, leaving as her sole heirs at law the defendant Joseph L. Shellenberger and Maggie Shellenberger, and her then husband, Leander Shellenberger, and upon the death of the said Emma Shellenberger the said land descended to the said Joseph L. Shellenberger and Maggie Shellenberger, her children and sole heirs at law, subject to the life estate of her husband, Leander Shellenberger, during his life, and said Leander became and was the tenant of said land by his right of curtesy, with the remainder after his death to the defendant and Maggie Shellenberger; that on or

about the 27th day of April, 1886, the said Leander Shellenberger, willfully, feloniously, and of his deliberate, premeditated malice, did kill and murder his daughter, Maggie Shellenberger, and she then and there died intestate and without issue, leaving her father, Leander Shellenberger, who murdered her for the purpose of possessing himself of her estate and title in fee-simple to the land aforesaid, and said plaintiffs claim that by and through said murder and the death of said Maggie Shellenberger the said Leander Shellenberger became a tenant in common of said premises with the survivor, Joseph L. Shellenberger; that on or about the 1st day of May, 1886, the said Leander Shellenberger was arrested and charged with the murder of said Maggie Shellenberger; that the said complainants herein, well knowing of the facts, and being attorneys at law, undertook the defense of said Shellenberger, and to secure them for their said services the said Leander Shellenberger did, on or about the 3d day of May, 1886, with his wife, Miranda Shellenberger, duly convey to the plaintiffs, by warranty deed duly executed, their interest in said premises, being the estate, as claimed by the complainants, for life of Leander Shellenberger, and one undivided one-half of the remainder; that shortly thereafter the said Leander Shellenberger was indicted and charged with the murder of said Margaret Shellenberger, and such proceedings were had in said cause in the state of Nebraska against Leander Shellenberger, indicted for the murder of his daughter, the said Maggie Shellenberger, that at the November term of the district court, sitting within and for Otoe county, in the year 1886, he was convicted and sentenced for said murder, which sentence and judgment of the court remains unreversed in said court; that afterwards, and on or about the 23d day of July, 1887, the said Leander Shellenberger was    *    *    *    hanged, and the defendant herein answering, charges and avers the fact to be that the said plaintiffs in said petition, at the time they

took a conveyance of said premises from said Leander Shellenberger and wife, well knew the facts, that the said Leander Shellenberger came to the said lands by the murder of his child, Maggie Shellenberger, and well knew all the proceedings in said court, resulting in his conviction, the judgment and sentence, and this defendant herein answering says, that the said Leander Shellenberger could acquire no estate, interest, or right, or title in and to the lands in controversy by and through his act of the murder of Maggie Shellenberger; and this defendant in further answering says, that the said Leander Shellenberger did willfully, maliciously, and of his premeditated malice kill and murder the said Maggie Shellenberger,    *    *    .* for the sole purpose of removing her from this life that he might inherit the lands which descended to her by and through the death of her mother; that the defendant in further answering says, that it is contrary to the law of the land that any should be permitted to come to an estate or an inheritance by their own willful act of murder; and the said defendant further answering says, that the said Leander Shellenberger could take no estate from the said Maggie Shellenberger, whose death he had compassed and produced, and that he took no estate to himself, and conveyed none to the said plaintiffs herein, and the said plaintiffs acquired no right, title, or interest in and to the said estate by and through the death of said Maggie Shellenberger, caused by said Leander Shellenberger as hereinbefore alleged.

"The said defendants therefore pray that this court will order a judgment and decree that the said Leander Shellenberger took no estate from the said Maggie Shellenberger, whose death was by him compassed and produced by willful murder, and that the said estate upon her death, and her interest in said estate upon her death, caused by the willful murder of the said Leander Shellenberger, descended to this defendant, and the said Leander Shellen-

berger took nothing by and through his act of willful murder of his own daughter; and for such other and further relief in the premises as equity and good conscience shall decree.                                          O. P. MASON,

*"Guardian ad litem for Joseph L. Shellenberger."*

To this answer plaintiffs demurred on the ground that it "did not state the facts sufficiently to constitute a defense to the said plaintiffs' cause of action." This demurrer was sustained, and, the defendant having elected to stand on his answer, judgment was rendered for such relief as was prayed in plaintiffs' petition, and appointing referees to make partition accordingly. These referees reported that partition could not be advantageously made of the property in kind, whereupon it was ordered sold, and that the proceeds of the sale should be divided between the parties plaintiffs of one part and the defendant of the other part. The defendant Joseph L. Shellenberger, by his guardian *ad litem*, as plaintiff in error, then brought the case to this court for a review of the ruling on the aforesaid demurrer and the judgment which logically followed it.

In the answer it was alleged, as will be noted by reference to the quotation just made, that plaintiffs, well knowing the facts, and to secure payment of their fees as attorneys at law in the defense of said Leander Shellenberger, received the conveyance by virtue of which they claim to be vested with the title to one-half of the property in question. This averment, admitted as it is by the demurrer, does away with the argument attempted as respecting the rights of *bona fide* purchasers. Under the circumstances charged, and admitted to be true for the purposes of the demurrer, the defendants in error are vested with no higher or better rights than could be asserted by Leander Shellenberger in his own behalf. The naked question presented is, whether or not the murder of an intestate by one to whom ordinarily as heir the property would have descended formed an exception to the statutory rules of inheritance.

The opinion hereinbefore filed affirmed this proposition; its correctness will now receive consideration.

Section 30, chapter 23, Compiled Statutes, provides: that "When any person shall die seized of any lands, tenements, or hereditaments, or of any right thereto, or entitled to any interest therein in fee-simple, or for the life of another, not having lawfully devised the same, they shall descend, subject to his debts, in the manner following: * * * Second—If he shall have no issue, his estate shall descend to his widow during her natural lifetime, and, after her decease to his father; and if he shall have no issue nor widow, his estate shall descend to his father." This statute has regulated the descent of real property in this state at least since 1866, for it is found in the Revised Statutes of that date. In the former opinion, COBB, C. J., said: "The principle of these cases [*New York Mutual Life Ins. Co. v. Armstrong,* 117 U. S., 599, and *Riggs v. Palmer,* 115 N. Y., 506], especially that of *Riggs v. Palmer,* is applicable to the case at bar; their analogies are immediate and certain." As these two cases seem to have specially influenced the court in arriving at its former conclusion, a brief consideration and analysis of them will not be foreign to our purpose.

*New York Mutual Life Ins. Co. v. Armstrong* was an action brought by the administratrix of the estate of John M. Armstrong, deceased, upon a life insurance policy issued to said intestate. This policy was what is known as an endowment policy; that is, a policy payable to the assured if he live a designated time, but to some other person named if the assured should die before the expiration of that time. It was payable, subject to certain conditions, to the assured, or his assigns, on December 8, 1897, or, if he should die before that time, to his legal representatives. Within six weeks after the issue of the policy the assured was murdered, and suspicion fell upon one Hunter, who held an assignment of the aforesaid policy, and who had been very

officious in procuring it to be issued to Armstrong.  Upon a trial duly had Hunter was convicted of the aforesaid murder, and was accordingly hanged.  The company set up several defenses to the action, one of which was that the policy was obtained by Hunter with the intent to cheat and defraud the company by compassing the death of the assured by felonious means and collecting the amount of the insurance,—a design which he attempted to carry out by causing the death of the assured.  Mr. Justice Field, in delivering the opinion of the court, discussed the right of the company to show that Hunter had in like manner procured to be issued other policies of insurance in the same manner as he had procured the issue of the policy upon which a recovery was sought.  No other discussion, except incidentally of the assignability of the policy, is to be found in the opinion of Justice Field, though in closing it he said: "But independently of any proof of the motives of Hunter in obtaining the policy, and even assuming that they were just and proper, he forfeited all rights under it when, to secure its immediate payment, he murdered the assured.  It would be a reproach to the jurisprudence of the country if one could recover insurance money payable on the death of the party whose life he had feloniously taken; as well might he recover insurance money upon a building which he had willfully fired."  No representative of Hunter was a party to the suit, and the language quoted was, therefore, in so far as it referred to the rights of Hunter, mere *obiter dictum.*

It may be that our statement, that the language above quoted was the only language which bore on the proposition which we have under consideration, should in a slight degree be qualified.  That it may be literally exact, a quotation will be made of expressions used argumentatively by Justice Field in his discussion of the admissibility of the evidence of the contemporaneous conduct of Hunter, to which reference has heretofore been made.  He said : "The

assignment conveying to Hunter the whole interest of the assured, his representatives alone would have a valid claim under it if the policy were not void in its inception.   Proof, therefore, that he caused the death of the assured by felonious means must necessarily have defeated a recovery, and the court erred in refusing to admit testimony tending to prove that such was the fact."   The language of Justice Field first above quoted, standing alone, is inapplicable to the facts stated in his opinion.   From the statement of the case which he was discussing, considered in connection with the quotation from his opinion last made, it is evident that both his quotations had reference to the admissibility of proffered evidence of like contemporaneous conduct of Hunter.   From his opinion, as an entirety, it is evident that proof of this conduct was deemed admissible because of the relationship of Hunter to the policy, independently of the assignment thereof to him.   If, as it was claimed, the evidence showed that Hunter acted as the agent of the assured, or in the interest of the assured in obtaining the issue of the policy in question, his own fraudulent conduct was rightfully considered in determining the validity of such policy as forming a basis for a recovery, no matter though the action had been brought by the representative of the assured.   As the language quoted was pertinent to the issues presented, and the rights of the parties depended on no other theory, it must be assumed that upon this theory alone the case was decided.   While this view renders the quoted language applicable to matters under discussion, it in equal degree renders it foreign to the facts of the case at bar.   This court was, therefore, mistaken in assuming that the analogies of the case of the *New York Mutual Life Ins. Co. v. Armstrong, supra,* were, as applied to the case at bar, "immediate and certain."

The majority opinion in *Riggs v. Palmer,* 115 N. Y., 506, was, however, that upon which the former conclusion of this court was specially based.   In the statement of

that case it was said that "this action was brought to have the will of Francis B. Palmer, deceased, so far as it devises and bequeaths property to Elmer E. Palmer, canceled and annulled." The facts involved, as given by Earle, J., in delivering the majority opinion, were as follows : "On the 13th day of August, 1880, Francis B. Palmer made his last will and testament, in which he gave small legacies to ·his two daughters, Mrs. Riggs and Mrs. Preston, the plaintiffs in this action, and the remainder of his estate to his grandson, the defendant Elmer E. Palmer, subject to the support of Susan Palmer, his mother; with a gift over to the two daughters, subject to the support of Mrs. Palmer, in case Elmer should survive him and die under age, unmarried and without any issue. The testator at the date of his will, owned a farm and considerable personal property. He was a widower, and thereafter, in March, 1882, he was married to Mrs. Bresee, with whom, before his marriage, he entered into an ante-nuptial contract, in which it was agreed that in lieu of dower and all other claims upon his estate, in case she survived him, she should have her support upon his farm during her life, and such support was expressly charged upon the farm. At the date of the will, and subsequently to the death of the testa- tor, Elmer lived with him as a member of his family, and at his death was sixteen years old. He knew of the provisions made in his favor in the will, and that he might prevent his grandfather from revoking such provisions, which he had manifested some intention to do, and to obtain the speedy enjoyment of possession of his property he willfully murdered him by poisoning him. He now claims the property, and the sole question for our determination is, can he have it?" Much of the opinion of Judge Earle was devoted to a defense of what he calls "rational interpretation." Quoting from Rutherford's Institutes, he said : "When we make use of 'rational interpretation,' sometimes we restrain the meaning of the writer so as to take in less,

and sometimes we extend or enlarge its meaning so as to take
in more than his words express." In the former opinion
filed in this case there is quoted approvingly from the afore-
said majority opinion, delivered by Judge Earle, this lan-
guage: "It is a familiar canon of construction that a thing
which is within the intention of the makers of the statute
is as much within the statute as if it were within the letter;
and a thing which is within the letter of the statute is
not within the statute unless it be within the intention of
the makers." The language just quoted was originally
used with reference to the construction of a will, but was
by COBB, C. J., applied to our statute of descent. For
this reason it will hereinafter be considered as though appli-
cable to statutory construction. The conclusion reached by
the reasoning of Judge Earle in *Riggs v. Palmer*, as well
as that in this case, was based very largely on that species
of judicial legislation above characterized as "rational con-
struction." If courts can thus enlarge statutory enactments
by construction, it may be that the references in the ma-
jority opinion in *Riggs v. Palmer* to the provisions of the
civil law were very apt as illustrating how, by rational
interpretation, our statutes should be made to read. This
reference to the civil law was as follows: "Under the civil
law, evolved from the general principles of natural law
and justice by many generations of jurisconsults, philoso-
phers, and statesmen, one cannot take property by inher-
itance or will from an ancestor or benefactor whom he has
murdered. (Domat's Civil Law, part 2, book 1, tit. 1, sec. 3;
Code Napoleon, sec. 727; Mackeldy's Roman Law, 530–
550.) In the Civil Code of Lower Canada the provisions
on the subject in the Code Napoleon have been substantially
copied." If our statutes of descent contained the above
provisions, there would be no difficulty in sustaining the
conclusion reached in the former opinion. It is because of
their absence that the difficulty arises. The necessity of
resorting to what is denominated "rational interpretation"

45

is a confession that our statute in that respect falls short of what it is deemed proper it should have provided. Indeed, there are expressions in the former opinion which in terms very nearly confess that the result reached was by judicial legislation. An instance of this is found in the following quotation therefrom: "I quite agree with the court of appeals that had it been in the minds of the framers of our statute of descent that a case like this would arise under it, they would have so framed the law that its letter would have left no hope for the obtaining of an inheritance by such means."

Similar illustrations and applications of the principle of rational interpretation to those made use of by the writer of the majority opinion in *Riggs v. Palmer* will be found referred to in Sedgwick on the Construction of Statutory and Constitutional Law, at the beginning of the sixth chapter. They are commented on in this language: "These and similar discussions have amused the fancy and exhausted the arguments of text-writers. I cannot, however, consider them of much value for the student of jurisprudence. Ours is eminently a practical science. It is only by an intimate acquaintance with its application to the affairs of life, as they actually occur, that we can acquire that sagacity requisite to decide new and doubtful cases. Arbitrary formulæ, metaphysical subtleties, fanciful hypotheses, aid us but little in our work." Later on in the same chapter this author says: "We may, therefore, affirm, as a general truth, that independently of constitutional questions, and independently of those doctrines of liberal and strict construction which really, as I have said, vest a sort of legislative power in the judge, the object, and the only object, of judicial investigation, in regard to the construction of doubtful provisions of statute law, is to ascertain the intention of the legislature which framed the statute. This rule, though often asserted, has been in practice frequently lost sight of; but there is abundant authority to sustain it.

'The only rule,' says Lord Ch. J. Tindal, 'for the con-
struction of acts of parliament is, that they should be con-
strued according to the intent of the parliament which
passed the act;' [citing *Dukedom of Sussex*, 8 London Jur.,
795]. The rule is, as we shall constantly see, cardinal and
universal, that if the statute is plain and unambiguous,
there is no room for construction or interpretation. The
legislature has spoken; their intention is free from doubt;
and their will must be obeyed. 'It may be proper,' it has
been said in Kentucky, 'in giving a construction to a stat-
ute, to look to the effects and consequences when its pro-
visions are ambiguous, or the legislative intention is
doubtful; but when the law is clear and explicit, and its
provisions are susceptible of but one interpretation, its con-
sequences, if evil, can only be avoided by a change of the
law itself, to be effected by legislative and not judicial ac-
tion; [citing *Bosley v. Mattingly*, 14 B. Monroe [Ky.], 89].
So, too, it is said by the supreme court of the United States:
'Where a law is plain and unambiguous, whether it be ex-
pressed in general or limited terms, the legislature should
be intended to mean what they have plainly expressed, and
consequently no room is left for construction;" [citing *United
States v. Fisher*, 2 Cranch, 358–399; *Case v. Wildridge*, 4
Ind., 51].

GANTT, J., delivering the opinion of this court in *Hur-
ford v. City of Omaha*, 4 Neb., 352, said: "It is said that
'no principle is more firmly established, or rests on a more
secure foundation, than the rule which declares, when a law
is plain and unambiguous, whether it be expressed in gen-
eral or limited terms, that the legislature shall be intended
to mean what they have plainly expressed;' and again, that
the intention of the legislature should control absolutely
the action of the judiciary. Where that intention is
clearly ascertained, the courts have no other duty to per-
form than to execute the legislative will, without any
regard to their own views as to the wisdom or justice of

the particular enactment. (Sedg. on Stat. and Con. Law, 325.)"

In our statute of descent there is neither ambiguity nor room for construction. The intention of the legislature is free from doubt. The question is not what the framers of our statute of descent would have done had it been in their minds that a case like this would arise, but what in fact they did, without perhaps anticipating the possibilty of its existence. This is determined, not by hypothetical resort to conjecture as to their meaning, but by a construction of the language used. The majority opinion in *Riggs v. Palmer,* as well as the opinion already filed in this case, seem to have been prompted largely by the horror and repulsion with which it may justly be supposed the framers of our statute would have viewed the crime and its consequences. This is no justification to this court for assuming to supply legislation, the necessity for which has been suggested by subsequent events, but which did not occur to the minds of those legislators by whom our statute of descent was framed. Neither the limitations of the civil law nor the promptings of humanity can be read into a statute from which, without question, they are absent, no matter how desirable the result to be attained may be. The legislature of this state, in 1873, adopted chapter 21, Compiled Statutes, providing for compensation for the widow and next of kin of a person whose death is caused by the wrongful act of another, even when such wrongful act amounts to a felony. This created a right of action which, but for the statute, would have had no existence. The facts of the case at bar may impress upon some future legislature the necessity of an amendment of our law of descent. From that source alone can such an amendment come. Originally, it is probable that the necessity for the act of 1873 was suggested by a case of hardship. The case at bar may prompt other legislation with respect to our statute of descent.

As the case of *Riggs v. Palmer* afforded the precedent which strongly influenced this court in reaching the conclusion heretofore announced, it will be profitable, as illustrating the dangers attending the use of case law, to call attention to a portion of the opinion delivered by Judge Earle, and to his misplaced reliance upon *New York Mutual Life Ins. Co. v. Armstrong, supra,* of which an analysis has hereinbefore been given. He said : " Besides, all laws, as well as all contracts, may be controlled in their operation and effect by general fundamental maxims of the common law. No one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime. These maxims are dictated by public policy, have their foundation in universal law administered in all civilized countries, and have nowhere been superseded by statutes. They were applied in the decision of the case of *New York Mutual Life Ins. Co. v. Armstrong,* 117 U. S., 591. There it was held that the person who procured a policy upon the life of another, payable at his death, and then murdered the assured to make the policy payable, could not recover thereon. Mr. Justice Field, writing the opinion, said: 'Independently of any proof of the motives of Hunter in obtaining the policy, and even assuming that they were just and proper, he forfeited all rights under it when, to secure its immediate payment, he murdered the assured. It would be a reproach to the jurisprudence of the country if one could recover insurance money payable on the death of a party whose life he had feloniously taken; as well might he recover insurance money upon a building that he had willfully fired.'" It is apparent from this quotation that the author of the opinion assumed that the action in the case of *New York Mutual Life Ins. Co. v. Armstrong* was brought by the representative of Hunter, and not by the representative of the assured. This misapprehension of the real interests in

controversy, and which were really adjudicated in that case, influenced the majority of the court of appeals of New York, and, by the superadded force thereby given it, this court was also led into error by the majority opinion in *Riggs v. Palmer*. From the application of an improper rule for the construction of statutes, and from the evident misconception of the points decided in *New York Mutual Life Ins. Co. v. Armstrong, supra*, we are led to believe that a rehearing was very properly granted in this case, and that it should be determined independently of the controlling force which at first was accorded to the cases cited, as supporting the views already announced in the opinion heretofore filed.

Reference has hereinbefore been confined to the majority opinion in *Riggs v. Palmer, supra*. Two of the seven judges, constituting that court, dissented. Gray, J., wrote the dissenting opinion, in which he said: "I cannot find any support for the argument that the respondent's succession to the property should be avoided because of his criminal act, when the laws are silent. Public policy does not demand it, for the demands of public policy are satisfied by the proper execution of the laws and the punishment of the crime. There has been no convention between the testator and his legatee, nor is there any such contractual element in such a disposition of property by a testator as to impose or imply conditions in the legatee. The appellant's argument practically amounts to this: That as the legatee has been guilty of a crime, by the commission of which he is placed in a position to sooner receive the benefits of the testamentary provision, his rights to the property should be forfeited, and he should be divested of his estate. To allow their argument to prevail, would involve the diversion by the court of the testator's estate into the hands of persons whom, possibly enough, for all we know, the testator might not have chosen or desired as its recipients. Practically the court is asked to make another will

Shellenberger y. Ransom.

for the testator. The laws do not warrant this judicial action, and mere presumption would not be strong enough to sustain it." This language commends itself as more nearly correct in principle, as applied to the case at bar, than to the case in which it was used, for in the latter it applied to the result effected by a will duly executed and probated. In the case at bar there is presented for determination the effect of a statute under and by virtue of which there is vested a certain estate, independently of every other consideration than the death of the ancestor. The force of this distinction is the more apparent when we recall the fact that the case of *Riggs v. Palmer* was brought to have the will of the testator canceled and annulled in so far as it devised and bequeathed property to the testator's murderer. Under such circumstances it might be very plausibly urged that if the testator had understood that his murder had been contemplated by his legatee to prevent the possibility of a revocation of the bequest to him, such revocation would have speedily followed, and upon this assumption the court might have been asked, with a show of propriety, to declare the revocation, which, but for the wrongful act of the legatee, would have deprived him of the bequest in his favor. It is not to be understood that we undertake to determine this either way. What we mean is, merely to illustrate the fact that in the case of *Riggs v. Palmer* the question of properly inferable unconsummated intention might have been plausibly urged, while in the case at bar there is no room even for plausibility.

The case of *Owens v. Owens*, 100 N. Car., 240, was where a widow was convicted of being accessory before the fact for the murder of her husband. She afterwards brought suit to have her dower assigned in the real property of which her husband died seized. As applicable to the facts of the case at bar, we quote from the opinion delivered in that case, as follows: "The natural feeling in-

spired by her proved co-operation in the unnatural and wicked act of taking her husband's life, and thus availing herself of the generous provision of the law that secures her surviving a home for life, is repugnant to a claim pre-ferred under such circumstances of perfidy to the marital relations.　In the absence of authority, the well instructed and able judge who tried the cause ruled against the allow-ance of dower, as it would in fact be 'to reward crime' by conferring benefits that result from and are procured by its commission.　We feel ourselves unable to concur in this conclusion, for the reason that, while the law gives the dower and makes it paramount to the claims of creditors even, there is no provision for its forfeiture for crime, how-ever heinous it may be, and even when the husband is its victim.　The only statutory provision which, for criminal misbehavior, bars an action prosecuted for the recovery of dower is where she shall commit adultery, and shall not be living with her husband at his death.　*　*　*　As there is no other act of the wife which by statute known to us works a forfeiture, we do not see how any legal obstacle can be in the way of her seeking to get what the law in unqualified terms gives her."　These conclusions have the countenance of other courts of more limited jurisdiction than those whose views have been given, but whose powers of discernment should not therefore be underestimated.

In the circuit court of Preble county, Ohio, the case of *Deem v. Milliken* was determined, and is found reported in 6 Ohio Circuit Court Rep., 357.　The opinion of the three judges comprising that court was delivered by Shauck, J. The defendants in error, by their answers and cross-peti-tions, alleged, in the court of common pleas, that Caroline Sharkey died intestate January 11, 1889, seized in fee of certain real estate, leaving surviving her a son, Elmer L. Sharkey, her sole heir at law; that thereafter Elmer exe-cuted to the defendants in error several mortgages to secure the payment of certain promissory notes.　Their cross-

petition contained appropriate averments as to the execution of the notes and mortgages, and for the assertion of a lien upon said real estate by virtue thereof. Answering this cross-petition, the plaintiffs in error, who are brothers and sisters of said Caroline Sharkey, deceased, admitted that said Elmer L. Sharkey was the son and only child of said Caroline Sharkey; that she died intestate, and alleged that on or about the 11th day of January, 1889, the said Elmer L. Sharkey murdered his mother for the purpose of succeeding to her title to the real estate, and that by due process of law he had been hanged on December 19, 1890, wherefore the plaintiffs in error alleged that said real estate did not descend to said Elmer L. Sharkey. In the court of common pleas demurrers to these answers were sustained, and distribution was ordered in favor of the mortgagees. In the opinion delivered in the circuit court, on error, the following apt and forcible language occurs: "The statute of descents neither recognizes a mischief nor provides a remedy. It is a legislative declaration of a rule of public policy. With respect to remedial statutes the rule quoted has frequent and salutary operation. The mischief and the remedy indicate the intention of the legislature and guide the court in giving it effect; but the rule affords no warrant for adding an important exception to a statute which, in clear language, defines a rule of public policy. Even in the consideration of remedial statutes courts should be guided by the maxim 'index animi sermo,' and the interpretation should be consistent with the language employed. Knowledge of the settled maxims and principles of statutory interpretation is imputed to the legislature. To the end that there may be certainty and uniformity in legal administration, it must be assumed that statutes are enacted with a view to their interpretation according to such maxims and principles. When they are regarded, the legislative intent is ascertained. When they are ignored, interpretation becomes legislation in disguise.

The well considered cases warrant the pertinent conclusion
that when the legislature, not transcending the limits of its
power, speaks in clear language upon a question of policy,
it becomes the judicial tribunals to remain silent. (*Hadden
v. Collector*, 5 Wall. [U. S.], 107; *Hyatt v. Taylor*, 42 N.
Y., 258; *In re Powers*, 25 Vt., 261; *State v. Liedtke*, 9
Neb., 468; *Flint Plank Road Co. v. Woodhull*, 25 Mich.,
99; *Jewell v. Weed*, 18 Minn., 272; *Woodbury v. Berry*, 18
O. St., 456; *Bruner v. Briggs*, 39 O. St., 478; *Kent v.
Mahaffey*, 10 O. St., 204.)   The decision in *Riggs v. Palmer*
is the manifest assertion of a wisdom believed to be supe-
rior to that of the legislature upon a question of policy.
Chief Justice Redfield (*In re Powers*) observes: 'It is
scarcely necessary, we trust, at this late day, to say that the
judicial tribunals of the state have no concern with the
policy of legislation.'"

It is unnecessary to enlarge upon this subject.   We can-
not, however, forbear observing that the title vested in
Leander Shellenberger by operation of law, and was de-
pendent upon no condition, not even his acceptance. Upon
the death of Maggie Shellenberger, the title vested in her
father *eo instanti*.   The language of section 30, chapter
23, Compiled Statutes, is comprehensive and free from am-
biguity, and we have been able to find no justification for
interference with it.

The former opinion filed in this case is disapproved and
the judgment of the district court is

AFFIRMED.