JOHN E. WALL et al. Plaintiffs in Error, vs. RAY PFAN-
SCHMIDT et al. Defendants in Error.

*Opinion filed October 16, 1914—Rehearing denied Dec. 2, 1914.*

1. STATUTES—*when statute is not open to construction.* If the
provisions of a statute are plain and unambiguous there is no room
for construction, and the courts cannot read into it exceptions or
limitations which depart from its plain meaning.

2. DESCENT—*fact that heir murders ancestor does not prevent
his inheriting.* In Illinois the Statute of Descent in plain and un-
ambiguous terms vests in the heir such estate as he is entitled to
immediately upon the death of the intestate from whom the in-
heritance comes, and the fact that the heir is criminally responsible
for the death of the intestate does not deprive him of his in-
heritance nor limit the same to a naked trust for the benefit of
other persons.

WRIT OF ERROR to the Circuit Court of Adams county;
the Hon. ALBERT AKERS, Judge, presiding.

JOHN E. WALL, *pro se.*

CARL E. EPLER, and GEORGE H. WILSON, for plaintiffs
in error.

GOVERT & LANCASTER, for defendants in error.

Mr. JUSTICE CARTER delivered the opinion of the court:

Plaintiffs in error filed a bill for the partition of certain
real estate, in the circuit court of Adams county, to the
June term, 1913. A demurrer thereto was sustained, and
the bill, which had been amended, was dismissed for want
of equity. Plaintiffs in error elected to abide by their bill
as amended and the cause was dismissed at their costs. A
writ of error was sued out to review that decree.

The amended bill averred that certain real estate was
devised under the will of Christian Abel to his daughter,
Matilda, for her natural life and at her death to her chil-
dren; that said Matilda intermarried with one Charles A.
Pfanschmidt and to them were born two children, Ray and

Blanche; that said Charles A. owned certain real estate adjoining that devised to his wife, Matilda, all of which the family occupied as a farm, residing on that portion devised to the wife; that on or about September 27, 1912, Ray Pfanschmidt, one of said children, murdered his father, mother and sister and Emma Kaempen, a school teacher boarding with them, setting fire to the residence and partly burning the remains of said four persons so killed, and that the order of their respective deaths could not be determined; that said Ray Pfanschmidt had been indicted in the circuit court of Adams county for the murder of said four persons and pleaded not guilty; that under the indictment for the murder of his sister said Ray Pfanschmidt was tried and found guilty and his punishment fixed by verdict of the jury at death, and that said criminal cause, at the time of this hearing in the court below, was pending in the trial court on motion in arrest of judgment. The motion in arrest of judgment has since been overruled and the criminal cause brought to this court by writ of error, the judgment of the trial court being reversed and the cause remanded for a new trial. (*People* v. *Pfanschmidt,* 262 Ill. 411.) The amended bill in this cause further alleged that Ray Pfanschmidt could not acquire any estate, right or title in and to said real estate through his act of murder; that Charles A. Pfanschmidt died intestate, leaving him surviving his son, Ray Pfanschmidt, the bill naming as other heirs decedent's father, brother, sisters, and children of a deceased brother and sister, and also enumerating the heirs of Matilda Pfanschmidt. It is further alleged that Ray Pfanschmidt executed his promissory note to Fred Pfanschmidt, his uncle, for $4000, secured by mortgage on the real estate described in the bill, and another promissory note for $4000 to George W. Govert and W. Emery Lancaster, secured by a second mortgage on said real estate; that Charles C. Pfanschmidt, the father of Charles A., quitclaimed to John E. Wall all his interest in said real estate,

and said Wall and his wife quit-claimed to E. W. C. Kaempen an undivided two-thirds of said real estate. It is further alleged that said mortgages are null and void except as to the real estate devised to said Ray Pfanschmidt by the will of his grandfather, Christian Abel. The prayer of the bill is for partition, and that the court declare that said Ray Pfanschmidt did not take or acquire any interest in the real estate of Charles A. Pfanschmidt, his father, Matilda Pfanschmidt, his mother, or Blanche Pfanschmidt, his sister, upon their death, because he caused their death for the purpose of inheriting; that he took no other interest than that devised to him in his grandfather's will. The bill further prayed that he be enjoined from conveying, mortgaging or otherwise encumbering said real estate, and if it should be deemed that he took the naked legal title, by descent, to any part of said real estate, that it be deemed that he was holding said legal title not for his own use and benefit but only as trustee for such parties equitably entitled thereto, and that partition of the equitable interests be made accordingly.

Both parties agree that the law is that when two or more persons perish in a common disaster there is no presumption, under the common law, of survivorship; that if survivorship is claimed it must be proved; (*Middeke* v. *Balder*, 198 Ill. 590; *Young Women's Christian Home* v. *French*, 187 U. S. 401; 1 Greenleaf on Evidence,—16th ed.—secs. 29, 30;) and that this rule would apply whether the common disaster was a wreck or accident on land or sea or the murder of several persons at practically the same time, as alleged in this case.

Plaintiffs in error concede that defendant in error Ray Pfanschmidt retained and did not forfeit his estate in the remainder devised to him under the will of his grandfather, Christian Abel. The sole question in dispute is whether he could acquire an interest, by inheritance, in the real estate owned by his father, mother and sister, who under the

pleadings in this cause met their death by his acts intentionally committed.

Our statute on descent provides "that estates, both real and personal, of residents and non-resident proprietors in this State dying intestate, * * * shall descend to and be distributed in manner following, to-wit: First, to his or her children and their descendants, in equal parts; * * * second, when there is no child of the intestate, nor descendant of such child, and no widow or surviving husband, * * * and if there is no parent living, then to the brothers and sisters of the intestate, and their descendants." (Hurd's Stat. 1913, p. 907.)

This statute has never been construed by the courts of this State as to the question here involved. Counsel for plaintiffs in error admit that under the literal wording of the statute Ray Pfanschmidt would inherit, but their argument is to the effect that in construing this as well as all other statutes the maxims of the common law must be applied, and that according to those maxims no one can be permitted to take advantage of his own fraud or wrong or acquire property by his own crime; that it must be assumed that the legislature, in passing the Statute of Descent, had these maxims in mind and that the statute should be construed according to such legislative intent; that so construed Ray Pfanschmidt acquired no interest in the estate of his father, mother or sister.

The authorities on this question in other jurisdictions are not in harmony. The courts of Great Britain do not seem to have been called upon to pass upon it until in very recent years, doubtless because of the ancient common law doctrine of attainder and corruption of blood. Under the civil law one could not take property by inheritance or will from an ancestor or testator whom he had murdered, but such deprivation plainly was intended in the nature of a punishment, as the property, in such case, escheated to the exchequer. (Domat's Civil Law, part 2, book 1, title 1,

sec. 3; *Riggs* v. *Palmer,* 115 N. Y. 506.) In most States the statutes of descent are based upon the rules of the civil law, (14 Cyc. 23,) but each State has its own rules. (3-5 Greenleaf's Cruise on Real Prop.—2d Am. ed.—146, note.) The English common law of descents had its foundation in principles of feudal policy. (Reeve on Descents, 1.)· Forfeiture of lands for felony was a doctrine of the old Saxon law, as a part of the punishment for the offense. The law of feudal escheat was brought into England at the conquest and superadded to the ancient law of forfeiture. (Sharswood's Blackstone's Com. vol. 1, book 2, p. 251.) Corruption of blood and forfeiture of lands in ordinary felonies were abolished by 54 Geo. III, chap. 45. (1 Chitty's Crim. Law, 735.) Later, in 1870, by statute of 33 and 34 Victoria, chapter 23, the entire doctrine of attainder, forfeiture and corruption of blood was abolished, except forfeiture consequent upon outlawry. (1 Jarman on Wills,—Bigelow's 6th ed.—*45, 46; 6 Ency. of Laws of Eng. 210; *Avery* v. *Everett,* 1 L. R. A. 264.) In recent years the English courts, both in Great Britain and in some of the colonies, have passed on this question.

Before the passage of the Forfeiture act of 1870, in *Amicable Society* v. *Bolland,* 4 Bligh's New Reps. 194, (1830,) it was held that the parties representing and claiming under one convicted (and executed) of a capital felony (forgery) could not recover insurance. The decision was on grounds of public policy. In *Cleaver* v. *Mutual Reserve Fund Life Ass'n,* 1 Q. B. 147, decided in 1892, it was held that Mrs. Maybrick, who was named as beneficiary in an insurance certificate of her husband, whom she was convicted of murdering, could not recover from the insurance company. The insurance money became a part of the estate of the insured as a resulting trust. The following British and colonial cases have been decided in harmony with the *Cleaver case,* all on the ground of public policy, following the maxim that one cannot take advantage of his

own wrong: *Lundy* v. *Lundy,* 24 Can. Sup. Ct. 650; *In re Cash,* 30 N. Z. L. 577; *Hall* v. *Knight & Baxter,* Eng. L. R. Ct. of App. 1 P. R. 1.

In this country the decisions in *Riggs* v. *Palmer, supra, New York Mutual Life Ins. Co.* v. *Armstrong,* 117 U. S. 591, *Ellerson* v. *Westcott,* 148 N. Y. 149, and *Perry* v. *Strawbridge,* 209 Mo. 621, are in harmony with the British and colonial cases above cited. On the other hand, it has been held that where there are explicit rules governing the descent of property by statute and there is nothing contained therein to justify exclusion, the one upon whom the law casts the property cannot, because of the murder by him of the ancestor or testator, be divested of it by the court. *Owens* v. *Owens,* 100 N. C. 240; *Deem* v. *Millikin,* 53 Ohio St. 668; *Shellenberger* v. *Ransom,* 41 Neb. 631; *Carpenter's Estate,* 170 Pa. St. 203; *DeGraffenreid* v. *Iowa Land and Trust Co.* 20 Okla. 687.

The first case in this country was that of *Owens* v. *Owens, supra,* decided in 1888. It was there held that a widow convicted as an accessory before the fact in her husband's murder and confined in the State prison therefor was entitled to her dower in his lands.

*Riggs* v. *Palmer, supra,* was decided in 1889. This was an action by the heirs-at-law of a testator against a beneficiary who had murdered the testator in order to obtain possession of the property given him by the will, to cancel the provisions for said beneficiary's benefit. The court decided that by reason of having committed said crime the beneficiary was not entitled to take under the will and that the property belonged to the heirs-at-law.

In *Deem* v. *Millikin,* 6 Ohio Cir. Ct. 357, (1892,) it was held that a son who murdered his mother for the purpose of procuring her property succeeded to the title to her real estate by virtue of the Statute of Descent in that State. This decision was affirmed in *Deem* v. *Millikin,* 53 Ohio St. 668.

*Shellenberger* v. *Ransom, supra,* which at the first hearing in the Supreme Court was decided in 1891, following the reasoning in *Riggs* v. *Palmer, supra,* was on rehearing decided to the contrary, and it was held that even though it was proved that a father murdered his daughter in order to possess himself of her estate, nevertheless he took the title under the laws of descent of that State.

In *Carpenter's Estate, supra,* (1895,) a son murdered his father to come immediately into possession of his estate. The son was convicted and hanged, and it was contended that because of his crime the title never vested in him. The court held that under the Statute of Descent in that State the title had vested in the son immediately upon his father's death.

*Ellerson* v. *Westcott, supra,* is cited by counsel for the plaintiffs in error, but the only holding in that case, which was a partition proceeding, was that the killing of the testator by a devisee for the purpose of realizing under the will did not render the devise void, and the court indicated that relief could be had against one committing the murder, in equity.

*McAllister* v. *Fair,* 72 Kan. 533, (1906,) was a proceeding begun in the probate court to obtain a distribution of the estate of one who had been murdered by her husband for the purpose of obtaining her property. The Kansas statute provided how property should descend, and contained no exception. The court held there was no justification for reading an exception into the statute which would preclude the husband from inheriting because of the crime he committed.

In *Wellner* v. *Eckstein,* 105 Minn. 444, decided in 1908, the wife murdered her husband for the purpose of acquiring his real estate. The court was not agreed as to whether a murderer could inherit under the Statute of Descent in that State, and the case was decided on other grounds.

In *Perry* v. *Strawbridge, supra,* (1908,) in a petition for partition, it was held that a man who murdered his wife to inherit half of her estate under the statute took no title by reason of his crime. There was no reference in the statute which indicated an exception.

In *DeGraffenreid* v. *Iowa Land and Trust Co. supra,* (1908,) it was held that a person was not prevented from inheriting the property of one he murdered where it did not appear the murder was committed for that purpose, there being nothing in the statute to justify the exclusion. See, also, as somewhat analogous to this case, *New York Mutual Life Ins. Co.* v. *Armstrong, supra, Schmidt* v. *Northern Life Ass'n,* 112 Iowa, 41, *Kuhn* v. *Kuhn,* 2 Ann. Cas. (Iowa,) 657, and *In re Merte's Estate,* 104 N. E. Rep. (Ind.) 753.

In some jurisdictions, as in New York, the conclusion has been reached that while the murderer takes a legal title which is unimpeachable in a court of law, a court of equity will deprive him of the use of the property by enjoining the enforcement of the legal right. In other jurisdictions it has been held that when the statutes make explicit provision for the descent of an intestate's property and specify the causes for which a will may be annulled or set aside, and neither the statute on descent nor on wills includes the case of a murder committed by an heir or devisee in order to obtain the property, the legal title which passes to the murderer under the Statute of Descent or by will is indefeasible. 21 Am. & Eng. Ency. of Law, (2d ed.) 238; 14 Cyc. 61.

While this question has never been passed upon by this court somewhat kindred questions have been decided. In *Holdom* v. *Ancient Order of United Workmen,* 159 Ill. 619, it was decided that the right of recovery by an insane beneficiary under a policy of life insurance was not forfeited by his killing the insured under such circumstances that the killing would be murder if the beneficiary were

sane. In *Supreme Lodge Knights and Ladies of Honor* v. *Menkhausen,* 209 Ill. 277, it was held that the murder of the insured by the beneficiary named in the benefit certificate precluded recovery of the insurance. In *Collins* v. *Metropolitan Life Ins. Co.* 232 Ill. 37, the insurance company disputed its liability for payment of insurance on the life of one convicted of murder and executed, on the ground that it was against public policy. There was no stipulation in the policy exempting the company and it was held liable for the policy on the murderer's life.

The rule of descent in this jurisdiction was first declared in the Ordinance of 1787, and the act of March 23, 1819, in force in 1822, was a literal transcript of the second section of said ordinance. (*Orthwein* v. *Thomas,* 127 Ill. 554.) The legislature of Illinois, at the same session at which it adopted the Statute of Descent, passed an act adopting the common law of England of a general nature and all British statutes of a general nature, with a few stated exceptions, made in aid of the common law, prior to the fourth year of James I. (Laws of 1819,—2d sess.—1; Hurd's Stat. 1913, p. 525.) This statute, however, provided specifically that only the common law of England of a general nature, so far as the same is applicable to our condition, shall be in force in this State. (*Penny* v. *Little,* 3 Scam. 301; *Lavalle* v. *Strobel,* 89 Ill. 370.) This being so, counsel argue that the same line of reasoning should be applied in construing this Statute of Descent as has been applied by this court in construing the statute as to the meaning of the word "children" in those cases wherein it has been held that the word "child" or "children" embraces only legitimate children, (*Blacklaws* v. *Milne,* 82 Ill. 505; *Orthwein* v. *Thomas, supra;*) and has also been applied in construing the statute as to the right of a non-resident alien to inherit. (*Wunderle* v. *Wunderle,* 144 Ill. 40; *Beavan* v. *Went,* 155 id. 592; *Meadowcroft* v. *Winnebago County,* 181 id. 504.) Those decisions are not decisive, as the

wording of the statute on the questions there involved practically required the conclusions reached. The rules of common law were only invoked as supporting that construction of the statute which, reading all its provisions together, was the reasonable construction.

In discussing the question here under consideration, Wharton on Homicide (3d ed. sec. 667,) states: "The broad theory has been asserted that all laws must be controlled, in general operation and effect, by the general fundamental maxim of the common law that no one shall be permitted to profit by his own wrong or found any claim upon his own iniquity or acquire property by his own crime, and the rule has been asserted that the statutes of descent and distribution are to be considered with reference to these principles, and that a murderer cannot be permitted to take thereunder, either as heir or legatee, the estate of one whom he has murdered for the purpose of obtaining his property. This rule, however, has been either rejected or limited and confined in its application, and the prevailing, if not the universal, rule would appear to be, that where a statute of descent and distribution, or provision for succession, is plain and unambiguous in its terms there is no room for construction or interpretation, and it operates solely within its own terms and vests in the heir such estate as he is entitled to immediately upon the death of the intestate from whom the inheritance comes, without reference to any question of criminal responsibility of the heir for the death of the intestate or devisor. This rule finds its inception in the theory that the public policy of a State is the law of that State as found in its constitution, its statutory enactments and its judicial records; and where the intestate law casts the estate of a deceased person upon designated persons this is absolute and peremptory, and no rule of public policy can take it from the persons designated by statute and give it to others, even for the reason that the

designated person killed the intestate, without a violation of the statute."

If in a statute there is neither ambiguity nor room for construction the intention of the legislature must be held free from doubt. The question as to what the framers of the statute would have done had it been in their minds that a case like the one here under consideration would arise is not the point in dispute. The inquiry is as to what, in fact, they did enact, possibly without anticipating the existence of such facts. This should be determined, not by conjecture as to their meaning, but by the construction of the language used. (*Shellenberger* v. *Ransom, supra.*) "Where there is no ambiguity in the words there is no reason for construction. The case must be a strong one, indeed, which would justify a court in departing from the plain meaning of the words,—especially in a penal act,—in search of an intention which the words themselves did not suggest." (Chief Justice Marshall in *United States* v. *Wiltberger,* 5 Wheat. 76.) The Statute of Descent does not in any way, directly or indirectly, recognize this question. The wrong to be obviated and the remedy for it will guide the court in finding the intention of the legislature, but this rule of law offers no authority for adding an important exception or limitation to a statute which in clear language states a rule of public policy. (*Deem* v. *Millikin, supra.*) Knowledge of the principles of statutory interpretation must be imputed to the legislature. In plain language our Statute of Descent designates the persons who shall succeed to the estates of deceased intestates. That statute provides that in cases like this the son and brother shall take the estate. By what authority can this court say that although there is a son and brother he shall not take, but that relatives who under the wording of the statute have no right to these estates shall take? It is impossible for the court to designate different persons to take such estate without a violation of the law. Under the rules for the interpretation

of statutes the courts cannot read into a statute exceptions or limitations which depart from its plain meaning. (*In re Carpenter's Estate, supra.*) If there were any ambiguity in this statute or if it were the province of the court to settle this question with respect to the descent of property, then the argument of counsel for plaintiffs in error would have weight. When the legislature has spoken in clear and unequivocal language the courts are bound thereby. (*McAllister* v. *Fair, supra.*) This court has held that the rules of the common law as to descent and devise have been wholly superseded by our statutes on those subjects. (*Kochersperger* v. *Drake,* 167 Ill. 122; *Collins* v. *Metropolitan Life Ins. Co. supra; North* v. *Graham,* 235 Ill. 178; *In re Mulford,* 217 id. 242.) In the *Collins case, supra,* while that case did not deal with the exact question here in point, this court quoted with approval the rules as to the proper construction of statutes on descent laid down in *Shellenberger* v. *Ransom, supra, Owens* v. *Owens, supra, Deem* v. *Millikin, supra,* and *In re Carpenter's Estate, supra.* To construe this statute as contended by counsel for plaintiffs in error in this case would in practical effect overrule the reasoning in the cases just referred to. The courts have no concern with the wisdom of a statute unless it contravenes some constitutional provision.

Plaintiffs in error argue that the holdings of the courts heretofore cited, construing statutes similar to ours, are without force in this State because many of them are code States, where, they argue, the common law is not in force. Kansas adopted the common law of England by statute declaring that "the common law, as modified by constitutional and statutory law, judicial decisions and the conditions and wants of the people, shall remain in force in aid of the general statutes of this State." (Gen. Stats. of Kan. 1909, sec. 9850.) Nebraska has a similar statute. By the decisions of the courts of Ohio and Pennsylvania the same rule has been laid down.

Counsel for plaintiffs in error further contend that if defendant in error obtained the title under the Statute of Descent, only the naked legal title passed to him; that he cannot hold it for his own benefit but only as a trustee *ex maleficio* and in trust for the heirs equitably entitled thereto, as held by the Court of Appeals of New York, (*Riggs* v. *Palmer, supra,*) basing the argument on like principles to those under which devises or bequests procured by fraud have been held constructive trusts, and applied, in equity, to the benefit of the persons equitably entitled thereto. 3 Pomeroy's Eq. Jur. sec. 1054; *Larmon* v. *Knight,* 140 Ill. 232; 2 Tiffany on Real Prop. sec. 505*a*.

Counsel argue that even though the grounds of public policy would not justify the construction of the Statute of Descent as contended for by them, public policy will forbid such a construction or enforcement of the statute as will encourage crime or give a reward for its performance. This doctrine was practically invoked in *Knights of Honor* v. *Menkhausen, supra,* but there it was as to the construction of a contract and not of a statute. This court has repeatedly held, in line with the general rule in other jurisdictions, that the public policy of a State must be sought in its constitution, legislative enactments and judicial decisions. (*Zeigler* v. *Illinois Trust and Savings Bank,* 245 Ill. 180.) In *Collins* v. *Metropolitan Life Ins. Co. supra,* we said (p. 44): "When the sovereign power of the State has by written constitution declared the public policy of the State on a particular subject, the legislative and judicial departments of the government must accept such declaration as final. When the legislature has declared, by law, the public policy of the State the judicial department must remain silent, and if a modification or change in such policy is desired the law-making department must be applied to and not the judiciary, whose function is to declare the law but not to make it. Limiting their actions to questions left open by the constitution and the statutes, courts may, no

doubt, apply the principles of the common law to the requirements of the social, moral and material conditions of the people of the State and declare what rule of public policy seems best adapted to promote the peace, good order and general welfare of the community; hence arises the rule that the decisions of its courts are to be investigated in determining the public policy of any government." Statutes of descent and devise are declarations of public policy of this State on this subject. To hold Ray Pfanschmidt obtained the naked legal title but only held it as trustee, as contended by counsel for plaintiffs in error, would be to hold that by his crime he forfeited the right to inherit. Section 11 of article 2 of the constitution of 1870 provides: "All penalties shall be proportioned to the nature of the offense, and no conviction shall work corruption of blood or forfeiture of estate." The Criminal Code, in fixing the punishment for murder, states: "Whoever is guilty of murder, shall suffer the punishment of death, or imprisonment in the penitentiary for his natural life, or for a term not less than fourteen years." (Hurd's Stat. 1913, p. 835.) It does not state that the guilty person shall forfeit his right to inherit. In *Collins* v. *Metropolitan Life Ins. Co. supra,* it was said (p. 42): These provisions are "clear and unequivocal declarations of the public policy of this State to the effect that no forfeiture of property rights shall follow conviction for crime." Public policy does not demand this forfeiture, for the demands of public policy are satisfied by the proper execution of laws and the punishment of crime. If other punishment be required, the duty to so provide rests upon the legislative branch of the government. Whether this accords with natural right and justice is not for the courts to decide. The laws of descent do not depend upon the ideas of court or counsel as to justice or natural right but depend entirely upon the provisions of the statute. (*In re Kirby's Estate,* 121 Pac. Rep. 370.) "The line between legislation and interpretation is clear, and for the

courts to declare a forfeiture for crime where the legislature has remained silent is legislation by judicial tribunals,— a subject with which they have no concern." *Holdom* v. *Ancient Order United Workmen, supra.*

The decree of the circuit court must be affirmed.

*Decree affirmed.*