ROSA WELLNER and Another v. JOSEPH A. ECKSTEIN and Another.[1]

September 25, 1908.

Nos. 15,448—(9).

**Assignment of Statutory Interest to Widow.**

Whether a widow, who has murdered her husband for the purpose of acquiring the real property of the intestate, may inherit under the statute of descent is not decided; the court not being able to agree. But a majority of the court are agreed that the order appealed from should be affirmed, on the ground that the decree of the probate court assigning to the widow her statutory interest in the real estate of her deceased husband is final.

Action in the district court for Nicollet county by the minor children of John Wellner, deceased, by their guardian, to secure a decree adjudging that defendants hold the legal title to the land in dispute as trustees ex maleficio for the benefit of the plaintiffs, and that plaintiffs are the owners thereof, one of the grantors of the defendants, the mother of the plaintiffs, having murdered her husband

[1] Reported in 117 N. W. 830.

to acquire title to the real estate involved. From an order, Olsen J., sustaining a demurrer to the complaint on the ground that the facts were not sufficient to constitute a cause of action, plaintiffs appealed. Affirmed.

*Hoidale & Somsen,* for appellants.

*Eckstein & Flor* and *Somerville & Hauser,* for respondents.

LEWIS, J.

On January 1, 1899, and for some years prior thereto, John Wellner and Emelie Wellner were husband and wife and residents of the county of Nicollet. On the day named he died intestate, the owner of a farm, of which eighty acres was their homestead, leaving him surviving his widow, Emelie Wellner, and two minor children, the plaintiffs herein. Thereafter such proceedings were duly had and taken in the probate court of the county of Nicollet that a final decree was duly made and entered by and in such court on November 11, 1899, whereby the homestead was duly assigned to the widow for her life, with an undivided one-third of the remainder of the real estate in fee, and the balance thereof to the two children. The deceased was murdered by his wife and hired man that they might marry each other and enjoy his property, and they were married on June 26, 1900, and on July 5, 1902, they executed for a valuable consideration a quitclaim deed of the land, so decreed to Emelie Wellner by the probate court, to the defendant Joseph A. Eckstein, who then had full notice and knowledge of the facts herein stated. Thereafter each of the grantors in the quitclaim deed was duly convicted[2] of the crime of murdering John Wellner, and sentenced to life imprisonment.

On April 6, 1907, the minor children, by their guardian, brought this action in the district court of the county of Nicollet, alleging in their complaint the foregoing facts, to secure a decree adjudging that the defendants hold the legal title to such interest in the lands as was decreed by the probate court to Emelie Wellner, as trustee ex maleficio for the benefit of the plaintiffs, and that they are the owners thereof. The defendants demurred to the complaint, and the trial court made its order, from which the plaintiffs appealed, sus-

[2] Indicted on December 2, 1901.

taining the demurrer on the ground that the facts stated in the complaint were not sufficient to constitute a cause of action.

Upon the facts admitted by the demurrer, the defendant Joseph A. Eckstein acquired only such rights, if any, in the land in question as his grantor, Emelie Tanke, formerly Wellner, had at the time the quitclaim deed was executed.

In the examination of this case I have had the benefit of the exhaustive discussion of the subject by Justice Elliott, whose views are concurred in by Justice Jaggard, and I have had before me also the views of the Chief Justice, concurred in by Justice Brown.

Two principal questions are presented by the appeal: 1. What is the proper construction of the state statutes with reference to the descent and distribution of the real property of an intestate, the surviving widow having murdered her husband for the purpose of acquiring the property? 2. The probate court having exercised its jurisdiction in administering the estate, and having made its final decree assigning the property to the widow and children, has the district court jurisdiction as a court of equity to set aside or modify the judgment of the probate court, whether the statute be strictly construed or be read with the implied exception that it has no application to one who has murdered the ancestor for the purpose of benefiting thereby?

Having come to the conclusion that the case should be affirmed upon the ground that the probate court possessed exclusive jurisdiction of the subject-matter, I accept, upon that point, the views expressed by the Chief Justice. The probate court is not endowed by the constitution with general equity powers, but is endowed with all powers, legal and equitable, necessary to the complete administration of the estates of decedents. The cases cited fully sustain this proposition. See also State v. Probate Court of Ramsey County, 103 Minn. 325, 115 N. W. 173. While the statute of descent defines who shall take the title upon the death of the ancestor, and the title passes by virtue of that statute, yet the construction of the statute and the determination of the heirs are incidental to and essential to the complete exercise of that court's jurisdiction. This result does not amount, in my opinion, to conferring upon the probate court the power to change the law of descent, as intimated by Justice Elliott

It is no more than the exercise by that court of its constitutional powers to determine what the law is and to give it effect by a final judgment.

As to the first question discussed in the respective opinions, I am not prepared to accept the view that the statute should be construed strictly, giving effect only to the language used, and that, if the legislature had intended to exclude murderers from its benefits, that intention would have been expressly inserted. I am unable to believe that it was ever contemplated by the legislators, who framed and enacted the statute of descent, that any person should be permitted to realize the benefits of those statutes, by committing the most atrocious of all crimes. Laws are passed for the preservation and enforcement of the common rights of all, and that no one may in such manner strike at the very foundations of society, for the purpose of securing personal benefit, is the underlying law upon which all statutes are founded. The fact that such a principle was not expressly written in the statute of descent indicates to my mind that it never occurred to any one that the construction suggested would ever be urged. If such an idea had occurred to the legislative body, is there any doubt that sufficient words would have been used to exclude the possibility of such an interpretation? I agree with the New York court of appeals on this question, and believe the cases to the contrary to be unsound in principle. Such being my view of the statute, I am of the opinion that the widow never inherited any estate whatever. In the probate court proceedings the facts were unknown, and the widow was permitted to receive the benefit of the statute. She thereby acquired an apparent title to real estate which in fact belonged to her children. What the procedure and what the remedy may be in such cases we cannot now determine.

A majority of the court are of the opinion that the entire matter is within the jurisdiction of the probate court, and the order appealed from is affirmed upon that ground.

START, C. J.

I concur in the conclusion that the order appealed from must be affirmed solely for the reasons following:

The precise question presented by the record is: Did any bene-

ficial interest in the land of her deceased husband ever vest in Emelie
Wellner, by reason of the fact that she was his wife and that he died
intestate, having been feloniously murdered by her, leaving her his sur-
viving widow? A determination of the question involves a construc-
tion of the statutes of the state relating to the descent and distribu-
tion of the property of intestates, the effect of the final decree of the
probate court assigning to the widow the use of the homestead and
one-third of the balance of the land of which her husband died seised,
and the claim that in any event she took no beneficial interest in the
land, but held the legal title as trustee ex maleficio for the plaintiffs.

1. The descent and distribution of the property of a decedent is
a matter within the exclusive control of the legislature, which may
give or withhold the right to inherit upon such conditions as it deems
just, and if the legislative intention as to such matter is expressed
in clear and unambiguous language there is no room for construction,
and effect must be given to the statute as it reads. The provisions
of our statute relating to descent and distribution, so far as here rele-
vant, are, and were at the time of Wellner's death, substantially as
follows: Whenever any person dies seized of any lands or interest
therein, not having lawfully devised the same, the homestead of
the decedent shall descend to the surviving spouse, free from any
testamentary or other disposition thereof not consented to in writing,
for life if there be any children or issue of a deceased child. The
surviving spouse shall also inherit an undivided one-third of all
other lands of which the decedent was seized at any time during
coverture, to the disposition of which by will or otherwise the sur-
vivor shall not have consented in writing. R. L. 1905, §§ 3646–
3648. It is to be noted that the statute is specific and clear, and
has prescribed the exact conditions upon which the surviving spouse
shall be entitled to share in the land of a decedent. If it had been
the intention of the legislature to impose on such right a further
condition or exception to the effect that no one should, by virtue
of the statute, take or inherit property from a decedent whom he had
murdered, it would have been a very easy matter to have expressly
provided for such a contingency.

It is, however, urged that to permit one to inherit from an ancestor
or spouse whom he has murdered would be so abhorrent and repug-

nant to natural law and justice that it must have been the intention of the legislature to make such a case an exception to the positive provisions of the statute, and therefore the exception will be implied, and the statute construed as if it so read. It is the settled doctrine of this court that the general terms of a statute are subject to implied exceptions, founded in the rules of public policy and the maxims of natural justice, so as to avoid absurd and unjust consequences. Duckstad v. Board of County Commrs. of Polk County, 69 Minn. 202–206; 71 N. W. 933; Baart v. Martin, 99 Minn. 197–211, 108 N. W. 945, 116 Am. St. 394. This rule of construction, however, applies only to cases where it is clear from all the provisions of the statute that the omission of the exception by the legislature was unintentional, and an intention to include it may be fairly inferred from all of the provisions of the statute. In every case the question is, what was the intention of the legislature, as disclosed by the language of the statute? State v. Board of County Commrs. of Polk County, 87 Minn. 325, 92 N. W. 216, 60 L. R. A. 161.

The exception which counsel for the appellants insist should be read by implication into the statute in this case is of such a character that no inference can be fairly drawn from the language of the statute that the legislature intended to include it therein. This conclusion is sustained by the great weight of judicial authority. The only case directly holding to the contrary, so far as I am advised, is Riggs v. Palmer, 115 N. Y. 506, 22 N. E. 188, 5 L. R. A. 340, 12 Am. St. 819, the reasoning of which was approved in Ellerson v. Westcott, 148 N. Y. 149, 42 N. E. 540, wherein it was held that the general terms of statutes regulating the devolution of property and the making and effect of wills are subject to the implied exception or condition that one cannot take property by inheritance or will from an ancestor or benefactor whom he has murdered, thereby reading into such statutes an exception found in the civil law and also in the Code Napoleon. It is to be noted that this case did not involve the construction and effect of a statute of descent, but involved only the question whether a devisee could take title to property under the will of a testator whom he had murdered to prevent a revocation of the will and to obtain the immediate possession of the property. It is not difficult to distinguish the cases, for there is a clear distinction

between a case where the title passes unconditionally by operation of the positive law of the state and one in which the title passes by the voluntary act of the testator.

The case of Carpenter's Estate, 170 Pa. St. 203, 32 Atl. 637, 29 L. R. A. 145, 50 Am. St. 765, in its facts is substantially like the one at bar. It was a case where a son murdered his father, and it was held that such fact would not justify the court in disregarding the statutes of descent and distribution, by which the son inherited as heir of his father. The court in its opinion reviewed the case of Riggs v. Palmer, declined to follow it, and said:

"In the case now under consideration it is asked by the appellant that this court shall decree, that in case of the murder of a father by his son the inheritable quality of the son's blood shall be taken from him and that his estate under the statute of distributions shall be forfeited to others. We are unwilling to make any such decree for the plain reason that we have no lawful power so to do. The intestate law in the plainest words designates the persons who shall succeed to the estates of deceased intestates. It is impossible for the courts to designate any different persons to take such estates without violating the law. We have no possible warrant for doing so. The law says if there is a son he shall take the estate. How can we say that although there is a son he shall not take but remote relatives shall take who have no right to take it if there is a son? From what source is it possible to derive such a power in the court? It is argued that the son who murders his own father has forfeited all right to his father's estate, because it is his own wrongful act that has terminated his father's life. The logical foundation of this argument is and must be, that it is a punishment for the son's wrongful act. But the law must fix punishments, the courts can only enforce them * * * It is argued however that it would be contrary to public policy to allow a parricide to inherit his father's estate. Where is the authority for such a contention? How can such a proposition be maintained when there is a positive statute which disposes of the whole subject? How can there be a public policy leading to one conclusion when there is a positive statute directing a precisely opposite conclusion? In other words when the imperative language of a statute prescribes that upon the death of a person his estate shall ve

in his children in the absence of a will, how can any doctrine, or principle, or other thing called public policy take away the estate of a child and give it to some other person. * * * There can be no public policy which contravenes the positive language of a statute."

In the case of Shellenberger v. Ransom, 31 Neb. 61, 47 N. W. 700, 10 L. R. A. 810, 28 Am. St. 500; Id., 41 Neb. 631, 59 N. W. 935, 25 L. R. A. 564, the facts were that a father murdered his daughter for the purpose of possessing himself of her estate as her only heir at law. The father was indicted for such murder, and to secure his attorneys for defending him he conveyed to them his interest in his daughter's estate. He was convicted, but while under sentence of death for his crime he was hanged by a mob. The court upon the original hearing of the case held, following Riggs v. Palmer, that the estate of the daughter did not pass, upon her death, to her father, for the reason that a person cannot take by the statutes of descent, the estate of a person whom he murders for the purpose of possessing such estate. But the court on a rehearing of the case receded from its first decision, and held that by virtue of the plain and unambiguous provisions of the statute of descent, which left no room for construction or interpretation, and by operation of the statute, title to the property in controversy vested eo instanti in the father upon the death of his daughter intestate, without reference to the cause or manner of her death.

In so holding the reasoning of the court was substantially as follows: "In our statute of descent there is neither ambiguity nor room for construction. The intention of the legislature is free from doubt. * * * The majority opinion in Riggs v. Palmer, as well as the opinion already filed in this case, seems to have been prompted largely by the horror and repulsion with which it may justly be supposed the framers of our statute would have viewed the crime and its consequences. This is no justification to this court for assuming to supply legislation, the necessity for which has been suggested by subsequent events. * * * Neither the limitations of the civil law nor the promptings of humanity can be read into a statute from which, * * * they are absent, no matter how desirable the result to be attained may be. * * * The well considered cases warrant the pertinent conclusion that when the legislature, not transcending the

limits of its power, speaks in clear language upon a question of policy, it becomes the judicial tribunals to remain silent. * * * Riggs v. Palmer is the manifest assertion of a wisdom believed to be superior to that of the legislature upon a question of policy."

It was held by the supreme court of Ohio in Deem v. Milliken, 53 Ohio St. 668, 44 N. E. 1134, affirming the reasoning of the court below (6 Ohio Cir. Ct. 357), that a statute of descent, clear in its terms, cannot, upon grounds of public policy or otherwise, be so construed as to exclude one who murders his intestate for the purpose of succeeding to his estate from the inheritance. The facts in that case were that a son, who was sole heir at law of his mother, murdered her for the purpose of succeeding to the title of her land, upon which he gave a mortgage to a third party. He was afterwards convicted of the crime and hanged. The action was between the brothers and sisters of the deceased and the mortgagee; the plaintiffs claiming that no interest in the land of the intestate descended to the son by reason of his crime. The court, in overruling this contention, stated [page 361] that: "No inference favorable to the plaintiffs in error can be drawn from the supposed familiarity of the lawmakers with the principles of the civil law where, by an exception, they who murder their ancestors are excluded from the inheritance. The natural inference is that when they incorporated the general rule into the statute, and omitted the exception, they intended that there should be no exception to the rule of inheritance prescribed."

It was held in the case of Owens v. Owens, 100 N. C. 240, 6 S. E. 794, that a wife who was accessory before the fact to her husband's murder did not thereby forfeit her right to dower in his estate, given to her by the laws of the state.

In Re Kuhn's Estate, 125 Iowa, 449, 101 N. W. 151, it was held that a widow, who was the murderer of her husband, was nevertheless entitled to the distributive share of his estate given in general terms by the statute of descent. Anent the claim that it would be contrary to public policy to permit a person to derive an advantage from his criminal act the court said: "But the public policy of a state is the law of that state as found in its constitution, its statutory enactments, and its judicial records. * * * And when public policy, touching a particular subject, has been declared by statute,

\* \* \* it is limited by such statute, and the courts have no authority to say that the legislature should have made it of wider application."

See also Murphy v. Renner, 99 Minn. 348, 109 N. W. 593, 8 L. R. A. (N. S.) 565, 116 Am. St. 418, where it was held that although a wife had abandoned her home, her husband and her children, and was living an adulterous life, an attempted conveyance of his homestead by the husband without her signature was void.

Upon principle and authority I am of the opinion that the terms of our statutes of descent and distribution are so clear, precise, and mandatory that there is no room for construction; that such statutes mean what their language imports, and nothing more; and, further, that by operation of law, independent of any act or volition on the part of Mrs. Wellner, the legal title to and the entire beneficial interest in the property here in question vested in her subject to the claims of creditors, if any, upon the death of her husband intestate. Noon v. Finnegan, 29 Minn. 418, 13 N. W. 197; Jenkins v. Jenkins, 92 Minn. 310, 100 N. W. 7.

2. If, however, there could be any fair doubt as to such conclusion, the doubt has been forever set at rest by the final decree of the probate court. This is so conclusively settled by the decisions of this court that any extended argument in its support is unnecessary. The probate courts are vested by the constitution of the state with exclusive jurisdiction over the estates of deceased persons and persons under guardianship, in the same manner and to the same extent that it gives to the district court jurisdiction over civil cases arising out of other matters. The final decree of the probate court assigning the residue of the estate of a decedent, pursuant to the statute (R. L. 1905, § 3790), concludes, unless reversed, all parties interested as to everything necessarily included in the decree. Greenwood v. Murray, 26 Minn. 259, 2 N. W. 945; State v. Ueland, 30 Minn. 277, 15 N. W. 245; Ladd v. Weiskopf, 62 Minn. 29, 64 N. W. 99, 69 L. R. A. 785; Fitzpatrick v. Simonson Brothers Mnfg. Co., 86 Minn. 140, 147, 90 N. W. 378; Chadbourne v. Hartz, 93 Minn. 233, 101 N. W. 68; Appleby v. Watkins, 95 Minn. 455, 104 N. W. 301.

The facts in Greenwood v. Murray were that a testatrix by her will devised in terms certain real estate to her trustee, to be sold by

him five years after her death, the proceeds thereof to be paid the named beneficiaries. The devise was void because it attempted illegally to suspend the power of alienation. The probate court, by its final decree of distribution, assigned the land to the trustee in trust for the purposes expressed in the will—an absolutely void trust before the decree was made. Nevertheless this court held that a final decree of distribution by a probate court assigning real estate to any person establishes his right thereto, as the judgment of any other court of competent jurisdiction would, and that, although the trust provided in the will was originally void, it was established by the decree as valid, and that it must be enforced.

In Ladd v. Weiskopf one of the questions was whether a decree of distribution, which erroneously construed the terms of a will, bound unborn children. The court, following Greenwood v. Murray, held that it would. In the opinion of the court in Fitzpatrick v. Simonson Brothers Mnfg. Co., the result of the decisions of this court was correctly and tersely stated by Mr. Justice Lovely in these words: "Where the probate jurisdiction rests upon the proper basis for judicial action, viz., death, property, and heirship, its judgment is final and conclusive upon all parties."

Now in this case the construction of our statute of descent—that is, whether it was subject to the implied exception contended for— and the further question whether the widow, by reason of her crime, should be declared a trustee ex maleficio, and the estate of the decedent assigned accordingly, were matters to be determined by the probate court. It follows that its decision thereon, by its decree of distribution, is final and conclusive, for, while our probate courts are not possessed of general equity powers, yet as to all matters of which they have exclusive original jurisdiction by virtue of the constitution they possess all powers, whether legal or equitable, which are essential to the exercise of such jurisdiction.

3. It is further claimed by plaintiffs' counsel that, if it be conceded that the legal title to the property in question vested in the widow by virtue of the statute, yet by reason of her crime she took no beneficial interest therein, and that equity will hold her as a trustee ex maleficio of the property for the use and benefit of the plaintiffs, the minor children of the decedent. The concession defeats the conclu-

sion, for equity follows the law, and where, as in this case, the legal title to property vests, not by the act or contract, express or implied, of the parties, but by the operation of a positive statute, which has been given effect by a final judgment of a court of competent jurisdiction, the owner of such a title cannot be charged as a trustee ex maleficio. Where a party by force, fraud, crime, or in any other unconscientious manner, secures the legal title to property which equitably belongs to another, or in which he has some interest, absolute or contingent, equity will impress a constructive trust upon the property and charge the holder of the legal title as a trustee ex maleficio for the party who has the beneficial interest therein. Nester v. Gross, 66 Minn. 371, 69 N. W. 39.

This rule, however, can have no application to the precise facts of this case, and no court, so far as I am advised, has ever applied it to a case like this one. The distinction between this case, where the legal title vested solely by statute, and the cases cited on behalf of the plaintiffs, in which the property rights claimed grew out of a contract, express or implied, or arose from the fraud or wrong of the alleged trustee with reference to the property, is obvious. So clearly marked is the distinction between the cases that it never occurred, it would seem, to the able courts whose decisions have been referred to that it could be seriously claimed by any one that the doctrine as to trustees ex maleficio could be applied to a case where the title vested by statute, for no reference is made to the claim in the opinions. In none of the cases cited and relied upon by counsel for plaintiffs did the legal title vest by statute, but nearly all of them involved the effect to be given to wills or life insurance policies. Where a testator by his will devises property to another, it is a reasonable and permissible construction of the will to hold that the devise was upon the implied condition that the devisee should not murder the testator, for manifestly such was the intention of the testator. Therefore, when the devisee murders the testator, there is a breach of the implied condition upon which the devise was made, and the devisee will not be permitted to take the gift. Page, Wills, § 687; 1 Underhill, Wills, § 160.

The same principle applies to a case where a testator disinherits his heir by his will, and thereby gives his property, upon his death, to another, but repents and intends to revoke his will, and to prevent the

revocation the legatee murders him; also to a case where a party gives his promissory note payable at a specified time after his death, and the payee or his indorsee feloniously kills the maker, and to cases where the beneficiary in a life insurance policy, or his assignee, murders the insured. An examination of the cases relied upon by the plaintiff shows that not one of them is a case where the legal title vested by statute, but all of them are in their facts analogous to the suggested cases, where the doctrine contended for by plaintiffs' counsel unquestionably applies.

But in this case neither the widow nor her grantee are asking or claiming anything from a court of equity. The absolute title to the property in question vested in the widow by virtue of the statute. Her children never had any interest therein, and her crime did not and could not deprive them of any property rights. Nor did she receive the property as a gift or bounty from her husband, for he could not have disposed of it by deed or will, or otherwise, without her written consent. Solely by operation of the statute the absolute title to the property in question vested in her. There is, then, no basis for charging her as trustee ex maleficio and decreeing the property to the children. To hold otherwise would be the setting aside of the positive written law of the state, the annulling of a final judgment of a court of competent jurisdiction giving effect to the statute, and the forfeiture of an estate as punishment for a crime, contrary to the mandate of our constitution.

This conclusion is regrettable, but it inexorably follows from the facts·in this particular case. The law ought to be otherwise, but the remedy rests with the legislature.

BROWN, J.

I concur in the views of the Chief Justice.

ELLIOTT, J. (dissenting).

The decision of the majority to the effect that the decree of the probate court is conclusive seems to infer general equity powers in that court which I had not supposed it to possess. I am obliged to dissent from the conclusion that Mrs. Tanke's title to this land rests upon the decree of distribution, and that she thereafter is personally immune from the controlling power of courts of general equity ju-

risdiction. As I believe that this court has power to dispose of the case upon its merits, I feel justified in stating the doctrines which in my judgment should control.

A decision which allows a murderer to inherit property from his victim shocks the moral sense of all right-feeling people, and that fact in itself strongly suggests that it is wrong in law, morals, and justice. Only the express mandate of the legislature will justify a court in reaching such a conclusion, and such mandate I do not find in the statute. In its absence no court having at its command the principles and doctrines of equity jurisprudence is justified in confessing impotence and inability to prevent the successful consummation of such a wrong. The statute is in general terms and controls the devolution of property under ordinary normal conditions. The legislature has not said that a wife who murders her husband shall not inherit his property; neither has it said that a wife who murders her husband shall inherit his property. It has said that a widow shall inherit a certain proportion of the property of her deceased husband, and it in my judgment leaves such exceptional and extraordinary cases as the present to be determined by fundamental principles which for generations have been established in our jurisprudence.

There are but few authorities upon the exact question, and they are conflicting. It is a remarkable fact that all the cases of this character have arisen in this country, where human life is said to be held less sacred than in other parts of the civilized world. The first case, that of Owens v. Owens, 100 N. C. 240, 6 S. E. 794, arose in 1888, and it was held that a widow, who had been convicted as an accessory before the fact of the murder of her husband and confined in the state prison under sentence therefor, was entitled to dower in her husband's lands because the statute which gave a legal dower contained no provision for its forfeiture in the event that she murdered her husband. The court felt that it was bound by the literal language of the statute and had no power to read therein an exception which was not expressed in the language. The same conclusion was reached in Deem v. Milliken, 53 Ohio St. 668, 44 N. E. 1134; Id., 6 Ohio Cir. Ct. 357; Carpenter's Estate, 170 Pa. St. 203, 32 Atl. 637, 29 L. R. A. 145, Williams, J., dissenting; and Shellenberger v. Ransom, 41 Neb. 631, 59 N. W. 935, 25 L. R. A. 564, reversing a former decision in the same case (31

Neb. 61, 47 N. W. 700, 10 L. R. A. 810, 28 Am. St. 500). The Pennsylvania case was approved extrajudicially in Holdom v. Ancient Order, 159 Ill. 619, 43 N. E. 72, 31 L. R. A. 67, 50 Am. St. 183.

On the other hand, the New York Court of Appeals, in Riggs v. Palmer, 115 N. Y. 506, 22 N. E. 188, 5 L. R. A. 340, 12 Am. St. 819, Gray, J., dissenting, held that, in enacting a general law providing for the devolution of property by will or descent, the legislature could not have intended that the provisions should operate in favor of one who murdered his ancestor or benefactor in order to speedily come into possession of his estate either as devisee, legatee, or heir at law. The legislature, when it used general language, could not have intended, says Judge Earl, that a murderer should inherit the property of his victim, and, "besides, all laws as well as all contracts may be controlled in their operation and effect by general, fundamental maxims of the common law. No one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime. These maxims are dictated by public policy, have their foundation in universal law administered in all civilized countries, and have nowhere been superseded by statutes."

This decision was approved in the subsequent case of Ellerson v. Westcott, 148 N. Y. 149, 42 N. E. 540. The same conclusion was reached in Ontario in McKinnon v. Lundy, 24 Ont. 132, affirmed in Lundy v. Lundy, 24 Can. Sup. Ct. 650, and by the supreme court of Missouri in the recent case of Perry v. Strawbridge, 209 Mo. 621, 108 S. W. 641, where it was held that the word "widower," as used in the statute, would not be construed to include a person who has made himself a widower by murdering his wife. In Re Kuhn's Estate, 125 Iowa, 449, 101 N. W. 151, it was held that the statute (Code, § 3386), which provided that "no person who feloniously takes or causes or procures another so to take the life of another shall inherit from such person, or take by devise or legacy from him, any portion of his estate," did not deprive a widow who was the murderer of her husband of her distributive share of his estate, which came to her under section 3366 as a matter of contract. The statute was subsequently amended so as to bring the surviving spouse within its terms.

I am not impressed by the supposed difficulties in the way of so construing this statute as to exclude a case of this character. The books are full of cases in which such construction has been resorted to, and the principle applied is neither novel nor extreme. The idea that the legislature will not be presumed to have intended to legislate unjustly early found expression by the writers on the common law, and Dwarris drew from Plowden and Coke the maxim of interpretation that, "when statutes are made, there are some things which are exempted and foreprized out of the provisions thereof, by the law of reason, though not expressly mentioned; thus, things for necessity's sake, or to prevent a failure of justice, are excepted out of statutes." [Potter's Dwarris, St. & Const. p. 123.] The courts have naturally and properly always striven to prevent injustice which would otherwise result in individual cases from the linguistic shortcomings of legislators. The limitations of language are such that it is practically impossible to so phrase a code or statute as to provide for all the manifold conditions and the possible emergencies which result from human activities. But justice must be presumed to be the ultimate purpose which the legislature had in mind, and, as said by a recent writer, "whenever the written law plainly contradicts the precepts of justice so inwoven into our nature as to seem instinctive, a doubt will be made whether the legislator really intended what he seems to have declared." Carter on Law, Its Origin, Growth, and Functions, p. 282. When a literal construction would result in an unjust, inequitable, and absurd conclusion, it is always held that the general language of the statute should not be so construed as to produce such a result. A statute should be construed in the light of the fact that there are many other rules and principles of law and equity, the existence of which were known by the legislature and the application of which may restrict its general language.

In Cleaver v. Mutual [1892] 1 Q. B. 147, which grew out of the famous Maybrick case, it appeared that Mrs. Maybrick had murdered her husband and that his executors claimed the proceeds of certain life insurance policies as against the assignees of the widow. The policy contained no exceptions which covered the case, and the married women's act of 1882 [45 & 46 Vict. c. 75] allowed a person to name his wife as beneficiary in a life insurance policy and create a

trust in the proceeds in her favor. It was held that the wife by mur-
dering her husband had rendered the trust incapable of performance.
In the course of the decision Lord Justice Fry remarked that the
language creating a trust must "be both subject to the principle of
public policy, * * * and the language of the statute must be
read as if it contained an exception of such a case."

Numerous cases illustrate the fact that the ultimate rights of par-
ties are not always measured by the strict and literal language of a
statute. A party's conduct may prevent him from availing himself
of an apparent right given by a statute. Connivance will bar the right
to a divorce, although not so provided in the statute. Lee v. Ham-
mond, 114 Wis. 550, 559, 90 N. W. 1073; Pierce v. Pierce, 3 Pick.
(Mass.) 299, 15 Am. Dec. 210; Robbins v. Robbins, 140 Mass. 528,
5 N. E. 837, 54 Am. St. 488; Wilson v. Wilson, 154 Mass. 194, 28
N. E. 167, 12 L. R. A. 524, and cases cited in note, 26 Am. St. 237.
In equity it is the settled rule that the fraudulent concealment through
some artifice or act of a cause of action will prevent the running of
the statute of limitations. 25 Cyc. 1214; Blair v. Bromley, 5 Hare
542; Moses v. St. Paul, 67 Ala. 168; Allen v. Conklin, 112 Mich.
74, 70 N. W. 339; Lieberman v. First Nat. Bank, 2 Pennewill (Del.)
416, 45 Atl. 901, 48 L. R. A. 514, 28 Am. St. 414. The same rule
prevails generally in actions of law. Shelby County v. Bragg, 135
Mo. 291, 36 S. W. 600; Quimby v. Blackey, 63 N. H. 77; 25 Cyc.
1215. A party who is guilty of fraud cannot avail himself of the stat-
ute of fraud for the purpose of protecting and retaining the fruits
of his fraud. 5 Viner, Abr. 523, pl. 40; Kinard v. Hiers, 3 Rich. Eq.
(S. C.) 423, 425, 55 Am. Dec. 643; Rogers v. Rogers, 87 Mo. 257;
Haigh v. Kaye, L. R. 7 Ch. 469. So a fraud will estop a widow from
claiming her dower. Dougrey v. Topping, 4 Paige (N. Y.) 94;
Smiley v. Wright, 2 Ohio, 506; Ellis v. Diddy, 1 Ind. 561; Connolly
v. Branstler, 3 Bush (Ky.) 702, 96 Am. Dec. 278. See cases cited
in a note in Shellenberger v. Ransom, 25 L. R. A. 564. Chapter 237,
p. 348, Laws 1901, provided that after the expiration of a designated
time the title to land registered under the Torrens system should be
indefeasible. No exceptions were made; but in Baart v. Martin, 99
Minn. 197, 108 N. W. 945, 116 Am. St. 394, it was held that when the

registration was secured by fraud, and the rights of innocent pur-
chasers were not involved, the decree would be vacated.

These cases, and many others which might be cited, show conclu-
sively that there are many things to be taken into consideration other
than the literal language of the statute. The exact ground upon which
the decisions proceed is not always clearly expressed; but by the ap-
plication of some rule of construction, or some common-law or equi-
table principle, a party is prevented from securing what an exact
and literal reading of a statute would give him.

While as a general proposition I find no difficulty in holding that
this statute was not intended to be for the benefit of such a criminal,
I nevertheless am of the opinion that under the conditions of this
case the legal title of the land passed to the widow. But she obtained
the title by fraud and crime, and a court of equity, acting in per-
sonam, should deprive her of the fruits of her crime. An effective
argument in favor of this view was presented by Dean Ames in an
article published in 36 Am. Law Reg. (N. S.) 225. In 2 Tiffany, Mod-
ern Law Real Prop., § 505a, it is said that certain cases, "though no
doubt correct in so far as they decide that the legal title to the prop-
erty of the deceased passes to the murderer, are probably incorrect
in that they fail to apply or recognize the principle that a court of
equity will intervene to compel one who acquires property by the
commission of a wrong to hold it as a trustee ex maleficio for the
persons rightfully entitled" to it. A writer in the New York Law
Journal says "that the requirements of these statutes can be satisfied
and yet a just result be reached by the application of the familiar
equitable principle that no one may take advantage of his own wrong,
and that one who through crime or fraud acquires the legal title to
property belonging to another must hold that property as a construct-
ive trustee for the person thus wronged or his representatives. * * *
No one will claim that the result reached in the Nebraska and this
Pennsylvania case was a just one, while the view here set forth ac-
complishes justice, violates no statute and preserves the rights of a
purchaser without notice of the crime or fraud. The application of
this just principle makes unnecessary the attempted distinction be-
tween cases of wills and cases where the statutory laws of descent are
in question."

This statement is quoted in 30 Am. Law Rev. 131, and the editor remarks that: "when a murderer comes red-handed into a so-called court of justice and there demands that the court shall execute a statute in a manner which never could have been intended by the legislature which enacted it, so as to allow him to come into the possession of property through a capital felony, * * * then the courts ought to withhold their aid. By granting it they make themselves in a moral sense accessories after the fact, and lend encouragement to murders of this kind." Another legal journal in picturesque language says: "It really seems to us that the question is too clear for debate. The position of the Nebraska, Ohio and North Carolina courts, that a murderer may inherit from his victim, because the statute of descent does not say that he shall not, seems almost grotesque in its blind narrowness amounting to practical immorality. One might as well contend that a highwayman who kills a traveler and takes his horse, although he must go to prison * * * is still entitled to the horse because the statute does not provide for the contrary! The Saviour probably did not think that the wicked men in the parable were sound in law when they said: 'This is the heir; come let us kill him, and the inheritance shall be ours.'" 6 Green Bag, p. 535.

As I understand the opinion prepared by the Chief Justice, it concedes that this equitable doctrine may properly be applied when the criminal is claiming under a will, but asserts that it is not applicable when the party claims under the statute of descent. But I see no difference in principle. The objections are that the technical requirements of a trustee ex maleficio are not present. But the controlling principle lies much deeper, and the technical trusteeship is merely the means by which the principle is applied and the result worked out. Nor does the application of this rule violate the maxim that equity follows the law, which means merely that equity applies to equitable titles and interests those rules of law by which legal titles are regulated, provided this can be done in a manner not inconsistent with the equitable titles and interests themselves. The doctrine that no man may profit by his own wrong lies deep down among the foundations of English jurisprudence. The maxim, "Nullus commodum capere potest de injuria sua propria," is a part of the common law.

Broom, Legal Maxims, p. 227. "It is a maxime of law, that no man shall take advantage of his owne wrong." Coke Litt. 148b; 1 Hale, P. C. 482; 2 Hale, P. C. 386; 2 Inst. 713; Plowd. 309; Findon v. Parker, 11 Mees. & W., 675, 680. "No system of jurisprudence" says Lord Justice Fry, "can with reason include amongst the rights which it enforces rights directly resulting to the person asserting them from the crime of that person." Cleaver v. Mutual [1892] 1 Q. B. 147. To permit this would be to subject the law "to the reproof of committing the flagrant injustice of an atrocious criminal enriching himself by his own crime." There is no presumption that a statute was intended to repeal the common law. Endlich, St. Const. § 127; Shellenberger v. Ransom, 25 L. R. A. 564, note. The principle that the operation of an act is to be interpreted in the light of the common law is, as we have seen, of constant application in all departments of the law, and parties are thus prevented from acquiring under the forms of the law new rights to which they are not in fact entitled.

Equity prevents fraud by taking from the wrongdoer the fruit of his deceit, and it accomplishes this by the beneficial doctrine of constructive trust. Whenever the title to property, real or personal, has been obtained by actual fraud, or through any other similar means, or under any other circumstances which render it unconscientious for the holder of the legal title to retain and enjoy the benefits of interest, equity imposes a constructive trust in the property in favor of one who is truly and equitably entitled to the same. The form and variety of these trusts are practically without limit, as the principle is applied whenever necessary for the doing of complete justice. Such trusts are raised for the purpose of working out right and justice, and often directly contrary to the actual intention of the party who holds the legal title. 1 Pomeroy, Eq. Jur. (3d Ed.) § 155; 3 Id. § 1053; 1 Story, Eq. Jur. (13th Ed.) § 256; Rollins v. Mitchell, 52 Minn. 41, 53 N. W. 1020, 38 Am. St. 519. This doctrine was applied in Nester v. Gross, 66 Minn. 371, 69 N. W. 39, where it was held that if one party obtains title to land by fraud, or by the violation of a fiduciary relation, or in any other unconscientious manner, so that he may not equitably retain it, a constructive trust will be imposed upon it in favor of one who in good conscience is entitled to

it. From what was said in Ellerson v. Westcott, 148 N. Y. 149, 42 N. E. 540, it appears that this was really the ground upon which Riggs v. Palmer was decided. "The relief which may be obtained against her" says Chief Justice Andrews, "is equitable and injunctive. The court in a proper action will, by forbidding the enforcement of a legal right, prevent her from enjoying the fruits of her iniquity. It will not and cannot set aside the will. That is valid, but it will act upon facts arising subsequent to its execution and deprive her of the use of the property."

The idea also appears in the Canadian case of McKinnon v. Lundy, 21 Ont. App. 560, in the Ontario Court of Appeal, where Maclennan, J. A., said: "One can easily understand that in the case of a murder committed with the very object of getting property of the deceased by will or intestacy, the court could defeat that object, even by taking away from the criminal a legal title acquired by such means; and it may be that the court would go further and take the legal title away even though the crime were committed without that object"— citing Lutterel v. Lord Waltham, cited in Huguenin v. Baseley, 14 Ves. 273, 290, and 2 White & Tudor, L. Cas. (6th Ed.) 611; Mestaer v. Gillespie, 11 Ves. 621, 639; Story, Eq. Jur. (13th Ed.) §§ 256, 440. When McKinnon v. Lundy reached the Supreme Court of Canada, the original opinion was reinstated, thus reversing the Ontario Court of Appeal, and holding that the heir forfeited the devise by his crime. The Chief Justice said: "The principle upon which the devisee is held incapable of taking under the will of the person he kills is, that no one can take advantage of his own wrong."

The doctrine has been applied under many varying conditions, but always for the purpose of preventing the wrongdoer from profiting by his wrong. The rule that, where the execution of a deed is induced by fraud or force, the legal title passes, but the grantee will be treated as a constructive trustee, is too familiar to require the citation of authorities. A devisee, who by fraud or force prevents the revocation of a will, will be considered a trustee for those who would be entitled to the estate if the will had been revoked. Gains v. Gains, 2 A. K. Marsh. (Ky.) 190, 12 Am. Dec. 375; Brown v. Doane, 86 Ga. 32, 12 S. E. 179, 11 L. R. A. 381, and cases cited in note. Fraud may be practiced in order to prevent, as well as secure, a convey-

ance, and at law the unexpressed intention of the grantor goes for nothing. But equity will see that the wrongdoer shall not profit by his wrong, and will require him to convey the legal title in such manner as to give effect to the defeated intention of the victim.

It was so held by Lord Thurlow in Luttrell v. Olmius, of which Lord Eldon, in Mestaer v. Gillespie, 11 Ves. 621, 638, said: "Lord Waltham, tenant in tail, meaning to suffer a recovery, and by will to give real interests to his wife, Mr. Luttrell, who by his marriage had an interest to prevent barring the intail, did by force and management prevent the testator from signing the deed to make the tenant to the præcipe: Lord Thurlow's opinion was clear, that, though at law Mr. Luttrell's lady was tenant in tail, and, which makes it stronger, she was no party to the transaction, yet neither he nor any one else could have the benefit of that fraud: and the jury upon an issue directed having found that the recovery was fraudulently prevented, Lord Thurlow held, even in favor of a volunteer, that the tenant in tail should not take advantage of the iniquitous act; though she was not a party to it; and the estate was considered exactly as if a recovery had been suffered." The same principle was applied by Lord Thurlow in Dixon v. Olmius, 1 Coxe, 414. In Middleton v. Middleton, 1 Jac. & W. 94, Lord Eldon again referred to the Luttrell case, and said that: "If a person be fraudulently prevented from doing an act, this court will consider it as if that act had been done, as in the case on Lord Waltham's will."

The methods by which the English courts of equity prevented the perpetration of frauds under St. 7 Anne, c. 20, were referred to in Baart v. Martin, 99 Minn. 197, 212, 108 N. W. 945, 116 Am. St. 394. By that act all unregistered conveyances were to be adjudged fraudulent and void against subsequent purchasers for a valuable consideration. In Doe v. Alsopp, 5 Barn. & Ald. 142, it appeared that there had been two assignments of the same lease and that the last executed had been first recorded. It was held that in a court of law the assignment which was recorded last, although executed first, must be treated as fraudulent and void, although the party claiming under the first recorded assignment had full knowledge of the prior execution of the first assignment. "A court of law" said Chief Justice Abbott, "is now called upon for the first time, to put a construction

105 M.—30

on the words of the statute, * * * it is impossible, that plainer words could be used, and I think, that, sitting in a court of law, we are bound to give effect to them, and that we cannot say, that this deed is not fraudulent and void within the meaning of this act, because, possibly it may turn out upon examination, that the defendant is entitled to some relief in equity." Mr. Justice Bayley said: "It is to be observed, that the words 'bona fide purchaser' are not used. I think, therefore, that we are bound in a court of law to give effect to these words." But many years before the decision of Doe v. Alsopp, Lord Hardwicke had held in Le Neve v. Le Neve, Amb. 436, 1 Ves. Sr. 64, 3 Atk. 646, that a person who purchased an estate after notice of a prior equitable right was a bad-faith purchaser, and would not be enabled by getting the legal estate to defeat such prior equitable interest, but will be held a trustee for the benefit of the person whose right he sought to defeat. This rule was approved by Lord Eldon in Davis v. Earl of Strathmore, 16 Ves. 419, 426. In Greaves v. Tofield, 14 Ch. Div. 563, Lord Justice James said that Lord Eldon had pointed out that there was no altering the language of the act of parliament; but giving the acts full force, and allowing the estate to go in priority to the first that registered, still, if that man had notice of anything by which his vendor or his grantor had bound himself, he was bound by it.

It is true that none of the cases in the English equity courts are exactly like the present; but the analogy is sufficiently close to justify this court in applying the principle of those cases and depriving Mrs. Tanke of the benefits which she would otherwise obtain as the result of her crime. The doctrine is expressly approved and applied by the New York Court of Appeals in Ellerson v. Westcott, 148 N. Y. 149, 42 N. E. 540. The abolition of the formal distinctions between law and equity have not affected the power of a court of equity in such case. The legislatures now, as formerly, enact statutes with full knowledge of the fact that the courts of equity still exercise their ordinary powers. As said in Baart v. Martin, 99 Minn. 197, 211, 108 N. W. 950, 116 Am. St. 394: "It must be presumed that the legislature understood and expected that the courts of equity would remain open to parties who were able to bring themselves within the rules which require the granting of equitable relief. The fact that

a statute does not expressly provide that fraud shall invalidate acts authorized to be done under it does not deprive the courts of the general power to protect the rights of parties." The fact that this statute does not expressly provide that a wife who murders her husband shall not inherit his estate does not by implication deprive the courts of equity of their ordinary powers to prevent the consummation of wrongs and fraud by acting directly upon and controlling the actions of individuals.

It is a remarkable fact that, while cases like the present were practically unknown in this country until within very recent years, they appear to have been quite common in older civilizations. The manner in which the questions were then disposed of is important only in so far as it confirms the statement of Lord Justice Fry that "no system of jurisprudence can with reason include amongst the rights which it enforces rights directly resulting to the person asserting them from the crime of that person." By the civil law those who, being capable of succeeding as heirs, rendered themselves unworthy thereof, were excluded from the succession. The causes which might thus render the heir unworthy were not limited to such as were expressly stated in the laws. They were, in fact, quite indefinite. "If there should happen" says Domat, "any other case where good manners and equity should require that an heir should be declared unworthy, it would be just to deprive him of the inheritance." Domat, Civil Law, part 2, bk. 1, t. 1, § 3; Mackelday, Roman Law, p. 550.

In bringing about this result the civil law proceeded upon what were substantially the same principles which we have found applicable under our system of equity jurisprudence. It did not regard the will as revoked or the heir disinherited by the crime. The naked legal title to the property passed to the criminal, but was thereafter taken from him. It was a case of restitution, not of revocation. Winscheid, Pandekten, 111, § 669, and note 1; lex 7, § 4, D. de bonis damnatorum (48, 20); D. 34, 9, de his quæ ut indignis auferuntur; Maynz. Cours, v. 3, § 482; 8 Harvard L. Rev. p. 170. Under the Code Napoleon (section 727) a person who is condemned for having caused or having attempted to cause the death of the testator, or, being informed of his murder, does not divulge it to the officers of the law, is excluded from the succession. A similar provision is

found in Quebec Code, §§ 610, 893. 1 Demolembe, Suc. 1, No. 217, et seq.

The invocation on Mrs. Tanke's behalf of the constitutional provision that no conviction shall work corruption of blood or forfeiture of estate rests upon a misapprehension of the scope and purpose of that provision. It found its way into the federal constitution in connection with the punishment for treason. It was adopted in the constitutional convention with little discussion as a precautionary measure suggested by the history of the English law of treason. An early act of congress (section 24, c. 9, Acts 1790, 1 St. 117) made the prohibition general by providing that "no conviction or judgment for any of the offenses aforesaid, shall work corruption of blood, or any forfeiture of estate." Similar provisions are found in the constitutions of several states. Stimson, Federal & State Constitutions, p. 182, note 6. By the common law a person convicted of a felony was by operation of law placed in a state of attainder, which resulted in forfeiture of estate, corruption of blood, and civil death. This result followed, not from the commission of the crime, but as a result of the conviction thereof. The attainted person was not divested of his land until after office found. So, in the case of goods and chattels, forfeiture had relation only to the time of conviction, and after the commission of a felony and before conviction the guilty party could make a valid sale or assignment of his personal property. 1 Blackstone, Com. 132; 1 Chitty, Crim. L. 733; Coke, Littl., § 199; Nichols v. Nichols, 2 Plowd. 477–486; Hawkins, P. C. bk. 2, c. 49, §§ 13, 30; Perkins v. Bradley, 1 Hare, 219. These provisions abolish the common-law rule by which corruption of blood and forfeiture of estate resulted from the conviction of a felony. Corruption of blood rendered the felon incapable of inheriting or of transmitting property by inheritance. Forfeiture of estate transferred his property to the state. The heirs were thus deprived of their inheritance and the treasury enriched, and it was to prevent the manifest wrong and injustice to innocent persons which resulted from this doctrine that these constitutional provisions were adopted. As said in Wallach v. Van Riswick, 92 U. S. 202, 23 L. Ed. 473: "No one ever doubted that it was a provision introduced for the benefit of the children and heirs alone; a declaration that the children should not bear the

iniquity of the fathers." It cannot apply to a case, such as the present, where the heir is the wrongdoer and is claiming the inheritance as the result of her own wrong. If an attempt was being made to corrupt the blood of Mrs. Tanke, thus preventing her from transmitting her estate to her children and forfeiting it to the state, we would have a case within the constitutional prohibition.

The decree of the probate court assigned the land in question to Mrs. Wellner, and the prevailing opinion is to the effect that this decree is final and conclusive as to her right to the land. It is, of course, settled that the probate courts of this state are vested by the constitution with exclusive jurisdiction over the estates of deceased persons, and their final decrees assigning the residue of an estate of a decedent, pursuant to R. L. 1905, § 3790, conclude all parties in interest as to everything properly determined by the decree. Greenwood v. Murray, 26 Minn. 259, 2 N. W. 945; Appleby v. Watkins, 95 Minn. 455, 104 N. W. 301, and other cases therein cited. But such a decree is final and conclusive only as to matters within the jurisdiction of the court, which were or might properly have been determined by the court in the course of the administration of the estate.

The probate court found that Wellner died seized of the lands in question, that the woman who is now known as Mrs. Tanke was the surviving spouse, and assigned the land in question to her. Upon all of these facts the decree, not having been appealed from, is now conclusive. But the title to the real estate did not vest in the widow by virtue of the decree of the probate court. It was required to determine who were the heirs of the deceased; that is, to ascertain and adjudge the fact of the identity of "the person upon whom the law casts the estate in lands, tenements or hereditaments immediately upon the death of his ancestor." 2 Blackstone, Com. 201; 21 Cyc. 413. It decreed that a certain person was the surviving spouse and one of the heirs—that is, one of the persons referred to in the statute; and its determination of her heirship is conclusive. Fitzpatrick v. Simonson Brothers Mnfg. Co., 86 Minn. 140, 147, 90 N. W. 378. It can no longer be questioned that this woman was the widow of John Wellner.

But the legal title to the real estate had vested in the heirs before this decree was entered. It was neither created, strengthened, nor perfected by the decree. The common-law rule with reference to the descent of the real estate of a deceased person prevails in this state, subject to modifications designed to subject such real estate, when necessary, to the payment of debts, devises, and expenses of administration. In this respect we maintain the old distinction between real and personal property. See 1 Woerner, Admn. § 276. The title to the personal property vests in the administrator or executor, and is the primary fund for the payment of debts. The title to real property vests in the heirs or devisees, and constitutes a secondary fund to be resorted to for the payment of debts, devises, legacies, or expenses of administration only after the personal property is exhausted. State v. Probate Court of Ramsey County, 25 Minn. 22; Noon v. Finnegan, 29 Minn. 418, 13 N. W. 197; Noon v. Finnegan, 32 Minn. 81, 19 N. W. 391; Sloggy v. Dilworth, 38 Minn. 179, 36 N. W. 451, 8 Am. St. 656; Hill v. Townley, 45 Minn. 167, 47 N. W. 653; Fleming v. McCutcheon, 85 Minn. 152, 88 N. W. 433; Kern v. Cooper, 91 Minn. 121, 97 N. W. 648; Jenkins v. Jenkins, 92 Minn. 310, 311, 100 N. W. 7. The personal representative of the deceased is entitled to the possession of the real estate and of the rents and profits arising therefrom until the estate is settled. After the debts, devises, legacies, and expenses are paid, the court by decree assigns the remainder of the estate to those entitled to it under the will or statute of descent. But, as said by Chief Justice Gilfillan in State v. Probate Court of Ramsey County, 25 Minn. 22: "This decree is not necessary to vest the title to the real estate, for that passes upon the death of the decedent. The effect of the decree upon real estate is to discharge it from the administration. Until then, it is assets and is liable to be applied, in default of personal property, to payment of debts and charges of administration, whether it remain in the hands of the heir or devisee, or has been by him conveyed to another. A purchaser takes with this liability upon it." The heir may thus transfer the title.

In Noon v. Finnegan, 29 Minn. 418, 13 N. W. 197, it was held that the statute had not changed the common-law rule, which gave to the heir the right to maintain an action for damages for trespass committed upon the land after the death of the ancestor. After referring

to various decisions in other states having similar statutes it was said that the right to the possession of the estate "is in the heir until the personal representative asserts his right and takes possession; that, on the death of the intestate, the lands descend, as at common law, to his heirs, who may maintain ejectment against third persons, if the personal representative has not taken possession; that the personal representative takes neither title to nor interest in the land, except the mere right to take possession during administration, if he sees fit to do so." "The personal representative," said Mr. Justice Mitchell "has no title to or interest in the real estate, save only the privilege to claim the possession during administration; and that, until he asserts this right, the rights of the heirs or devisees are unaffected by the statute"—that is, the realty descends to the heir, "subject to a naked power to be sold on the happening of the contingency named." 1 Woerner, Admn. § 276. In Jenkins v. Jenkins, 92 Minn. 310, 311, 100 N. W. 7, it was held that the widow could maintain ejectment for the possession of the land; it not appearing that the administrator had taken possession thereof. The title which the heir thus acquires cannot be affected by subsequent legislation subjecting the land to liabilities which were not imposed by the law when the title became vested. In re Noon's Estate (Ore.) 88 Pac. 673.

It follows that upon the death of Wellner the title to his real estate passed to his heir; but Mrs. Wellner took the title subject to whatever defects existed therein, and subject to such limitations thereon as grew out of the fraudulent and criminal methods by which it was acquired. The land was not required for the payment of debts or expenses, and the administrator never took possession. The nature, character, or quality of her title was not affected by the decree of the probate court. As said by Judge Cooley in Dickison v. Reynolds, 48 Mich. 158, 12 N. W. 24, when the estate has been fully administered, "the assignment is a matter of course and a mere formality." In Rich v. Victoria Copper Mining Co., 147 Fed. 380, 77 C. C. A. 558, which was an action of ejectment to recover lands where it was claimed that the wife's title had been established by the decree of the probate court, Severens, C. J., said: "The probate court distributes and assigns the property of the intestate to those apparently entitled to the possession, but it does not by its order originate or establish any muniment of

title to the real estate in the distributees." I am unable to see how this rule is affected by the fact that our probate courts are constitutional instead of statutory courts.

In my judgment the widow acquired the naked legal title to this real estate, subject to the power of a court of equity to deprive her of its beneficial use and require its conveyance as justice and equity demand. The administrator never took possession. The land was not required for purposes of administration. The effect of the decree, as said by Chief Justice Gilfillan, was "to discharge the land from the administration." The decree in no way affected the character of Mrs. Wellner's title to the land. She held it after as before the decree with all its deficiencies, and a court of equity might still deprive her of its beneficial use and require her to convey the title to her children.

I therefore respectfully dissent.

JAGGARD, J., concurs with ELLIOTT, J.